**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ALABAMA**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | } | |
| | } | |
| CLYDE L. DAVIS, JR., | } | Case No. 13-40938-JJR |
| | } | |
| Debtor. | } | Chapter 7 |

---

| | | |
|---|---|---|
| In re: | } | |
| | } | |
| CLYDE L. DAVIS, JR., | } | Case No. 13-42039-JJR |
| | } | |
| Debtor. | } | Chapter 13 |

# M E M O R A N D U M   O P I N I O N

The issues addressed in this Opinion do not pertain so much to the debtor's assets, debts or financial matters, or the circumstances that led him into bankruptcy.  Rather the Court must examine the surreptitious scheme the debtor's chapter 7 attorney concocted to collect his fees from the debtor on a postpetition basis.  This was not a one-off occurrence; similar postpetition-fee arrangements were employed by the same attorney in at least 200 additional chapter 7 cases.  And what is most disturbing is his payment scheme was structured to avoid detection; indeed, it went undetected for more than two years.

Clyde L. Davis, Jr. ("Davis") was the debtor in both of these cases.  The first case was filed on May 14, 2013 under chapter 7 of Bankruptcy Code.[1]  On November 15, 2013, after receiving a discharge in the chapter 7 case, Davis filed a second case, this time under chapter 13.

---

[1] 11 U.S.C. § 101, *et seq.* and herein the "Code."  The Federal Rules of Bankruptcy Procedure are herein referred to collectively as the "Rules" and individually as a "Rule." References herein to a "Doc.__" are to documents filed in Davis's chapter 7 case, and references to a "Chapter 13 Doc.__" are to documents filed in his chapter 13 case.

Attorney LeRoy Alan Cobb ("Cobb") and his firm, Cobb Law Firm, LLC,[2] represented Davis in the chapter 7 case; another attorney represented Davis in the later-filed chapter 13 case. Cobb's fee arrangements with Davis and other chapter 7 clients were brought to the Court's attention by the United States Bankruptcy Administrator ("BA") in a Motion to Examine the Debtor's Transactions with Attorney, Disgorgement of Attorney's Fees and Other Relief (Doc. 35 and herein, the "BA's Motion").

A hearing was held on the issues raised in the BA's Motion. At the hearing, Davis testified about his experience with Cobb and in particular about his attorney fee agreement, and Cobb also testified regarding Davis's case and other chapter 7 cases he handled. Cobb and the BA each filed a memorandum in support of their respective positions, made arguments in open court based on their perception of law and facts, and offered exhibits for the Court's consideration.[3]

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 151, 157(a) and the General Order of Reference dated July 16, 1984, as amended July 17, 1984, entered by the

---

[2] In Cobb's Memorandum (*infra* n. 3) he stated that he is the "sole shareholder" in his firm. The Court is aware that one additional lawyer practices with Cobb's firm, Bethany Cobb Courville; her name appears on the firm's letterhead next to Cobb's (Cobb Ex. 6) and she participated in the hearing on the BA's Motion. The Court's review of its records confirmed Cobb's statement at p. 14, n. viii of his Memorandum that since at least January 2013, virtually all chapter 7 cases filed by Cobb's firm, regardless of which attorney signed the petition, appear to have utilized the postdated check arrangement discussed in this Opinion.

[3] Cobb filed a memorandum (Doc. 52 and herein, "Cobb's Memorandum") in response to the BA's Motion, and the BA filed his own memorandum (Doc. 53 and herein, the "BA's Memorandum") in support of his Motion and in reply to Cobb's Memorandum. Cobb offered several affidavits from clients who purported to be satisfied with Cobb's representation. The BA objected to the admission of the affidavits on hearsay grounds, and the Court sustained the objection. Regardless, client satisfaction is not relevant to the issues arising from Cobb's postpetition fee arrangements.

United States District Court of the Northern District of Alabama. This is a core proceeding arising under Title 11 of the United States Code as defined in 28 U.S.C. § 157(b)(2)(A).

## FINDINGS OF FACT

For at least the last two years, Cobb followed the same *modus operandi* for collecting his fees and expenses charged in virtually all chapter 7 cases he and his firm filed on behalf of their clients.[4] When a prospective chapter 7 debtor first contacted Cobb – usually by phone – he was told to bring his checkbook to Cobb's office for the initial attorney-client meeting. At that meeting, the prospective debtor was instructed to write 15 postdated checks for $100.00 each, payable to Cobb. This routine became so commonplace that Cobb had stamps prepared so he could quickly stamp the checks with the monthly payment amount (i.e., $100) and his name, "L A Cobb," as payee.[5] The checks were dated for 15 consecutive months, with the first dated approximately one month after the initial meeting. The checks were then sealed in an envelope addressed to Cobb, with postage affixed. The envelope containing the checks was given to the prospective debtor with instructions to mail it back to Cobb after Cobb's office called and told the debtor his case had been filed. Cobb did not dispute that virtually all debtors followed his instructions and returned the envelope. The following month, and for 14 months thereafter, one

---

[4] Cobb recites in his Memorandum at p. 14, n. viii that he filed 188 chapter 7's in 2013 alone, and at pp. 2-3 of his Memorandum states that he began using the postdated-check payment plan in the early part of 2012. There was little disagreement in the recitals of facts in the BA's Memorandum and Cobb's Memorandum. Likewise, there was no material disagreement between Davis's testimony and Cobb's testimony, or Cobb's admissions and statements made at the hearing. Additional facts in Davis's two cases, and numerous chapter 7 cases handled by Cobb and his firm during the relevant period, were gathered from the Court's files maintained through CM/ECF.

[5] *See* BA Exhibit 9, containing copies of Davis's "stamped" checks.

3

of the checks was deposited by Cobb into his operating account, not a trust account maintained for clients' funds.[6] The checks dated for the first three months, and in some cases a small portion of the fourth, were used by Cobb to pay filing fees associated with the case, and the remainder were applied to his fees and expenses.[7]

At the initial meeting between Cobb and Davis – and other chapter 7 clients – they signed a two-page, 14-paragraph agreement entitled "Contract Required Under Code Section 528." (Cobb Ex. 1 and herein the "528 Contract".)[8] The first eleven paragraphs, all on the first page of the 528 Contract, described the services to be provided by Cobb, and the fees and expenses charged for those services. The last three paragraphs, all on the second page, began with the caption "Terms of Payment," and read as follows:

> 12. The Debtor(s) understand and the Cobb Law Firm agrees that BY LAW the Cobb Law Firm has NO RIGHT TO PAYMENT for any fees that the Debtor(s) owe the Cobb Law Firm at the time of the filing of the Chapter 7 Bankruptcy. This means that this is a debt that Debtor(s) DO NOT HAVE TO PAY the Cobb Law Firm either during the Chapter 7 Bankruptcy or after the Chapter 7 Bankruptcy is over;
> 13. The Debtor(s) understand that at the end of their Chapter 7 Bankruptcy, the Bankruptcy Court will DISCHARGE ANY PERSONAL LIABILITY that the Debtor(s) have on any debt owed to the Cobb Law Firm. A discharge of personal liability means that the Debtor(s) have NO LEGAL OBLIGATION TO EVER REPAY any part of the debt that the Debtor(s) may owe the Cobb Law Firm;

---

[6] The $1,500 total of the checks covered the case filing fee as well as Cobb's attorney fee and expenses. Cobb's expenses included the credit counseling fee and cost for a credit report.

[7] Davis's filing fees were $306.00. Filing fees have increased from time to time, thus for some earlier cases they would have been less.

[8] Cobb Ex. 1 included three additional documents entitled, respectively: (1) "Important Things to Know About Your Chapter 7 Bankruptcy" (signed by Cobb and Davis), (2) "Notice" (signed only by Davis and, among other things, warning him – ironically – to be truthful when providing information for his schedules), and (3) "Important Information About Bankruptcy Assistance Services From an Attorney or Bankruptcy Petition Preparer" (signed only by Davis). A 528 Contract and the three additional documents were provided to, and signed by, Cobb's other chapter 7 clients.

4

14. The Debtor(s) understand the Debtor(s) have a legal right to VOLUNTARILY REPAY the debt to the Cobb Law Firm after the Chapter 7 Bankruptcy ends. The Debtor(s) understand that any repayment to the Cobb Law Firm WILL BE STRICTLY VOLUNTARY and this means the debtor(s) have the legal right to repay in full, or repay in part, or REPAY NONE OF THE DEBT."

(Cobb Ex. 1.)

Conspicuously absent from the 528 Contract and other documents (*supra* n. 8) provided by Cobb to his clients, was any mention of the postdated checks and the return envelope.

Remember that Davis first filed a chapter 7 case and soon thereafter filed a second case under chapter 13. When Davis filed the chapter 13 petition, some of his postdated checks given to Cobb had not been deposited. Thus, a portion of the fees Davis agreed to pay Cobb remained unpaid, so Cobb was listed as a creditor – albeit a creditor whose claim was disputed – on Davis's chapter 13 Schedule F. (Chapter 13 Doc. 1, p. 26.) Even after receiving notice of Davis's chapter 13 case and the ensuing automatic stay, Cobb did not break stride but deposited one of the remaining postdated checks he had received from Davis.[9] The check was paid by Davis's bank; however, in response to a demand by Davis's chapter 13 attorney, Cobb refunded the amount of the check to the chapter 13 trustee, and thereafter the money was apparently returned to Davis. (Chapter 13 Doc. 20.)

According to Cobb, after his postdated check scheme was laid bare, he returned all Davis's undeposited checks and likewise returned all undeposited checks to those of his chapter 7 clients for whom he still held postdated checks.[10] But even though Cobb decided it was

---

[9] Although Cobb admitted he received notice of Davis's chapter 13 filing, he claimed not to have recognized the notice as pertaining to a case in which he was shown as a creditor rather than debtor's counsel.

[10] Cobb Memorandum, p. 5. The Court assumes Cobb and his firm stopped employing the postdated check arrangement after being challenged by the BA.

prudent to return the undeposited checks, he did not give up on collecting his fees. The first paragraph of Cobb's transmittal letter returning undeposited checks to his chapter 7 clients stated the following:

> Enclosed are the checks that remain of the original checks that you mailed to me. The task of keeping up with the checks has become too time consuming and has caused me unforeseen problems. *Hopefully, mailing me a payment each month will not cause you any problems.*

(Cobb Ex. 6, emphasis added.)[11]

Cobb closed his transmittal letter with the following offer:

> If you want a refund for the attorney fee you paid to me [in addition to the undeposited checks being returned], please mail me a legible copy of your driver [sic] license or some other picture Id [sic] and I will mail you a refund as soon as I can.

(Cobb Ex. 6.)

Only chapter 7 clients for whom Cobb still held undeposited checks received the offer for a refund of previously deposited checks. Clients whose checks had all been deposited received no such offer and were not otherwise notified that the method Cobb set up for them to pay his fee had caused him "unforeseen problems."[12]

---

[11] Although at first glance appearing contrite, Cobb's request that his clients mail him monthly checks to replace the postdated checks was actually an act to collect a discharged debt, and violated the discharge injunction yet again. "A discharge . . . operates as an injunction against . . . an act [] to collect, recover or offset any . . . debt [discharged under Code § 727] . . . ." Code § 524(a)(2).

[12] Cobb offered no explanation of why only debtors for whom he still held undeposited checks should be offered refunds (in addition to a return of their undeposited checks), while those unlucky debtors whose checks had all been deposited should receive nothing. If refunds were made to all 188 debtors for whom Cobb admitted filing chapter 7 cases during 2013 (*supra* n. 4) the amount refunded, plus undeposited checks would total close to $250,000. Cobb admitted he began using his postdated-check fee arrangement in early 2012 (*supra* n. 4), so the fees he would have to refund if the offer were extended to all debtors who paid with postdated checks could be substantially greater than $250,000. The total refunded would depend on how many debtors took Cobb up on his offer, unless, of course, the refunds were mandatory.

Case 13-40938-JJR7    Doc 54    Filed 07/11/14    Entered 07/11/14 15:04:23    Desc Main
Document    Page 6 of 31

The Disclosure of Compensation, Official Form B203 (Doc. 1, p. 41), filed by Cobb in Davis's chapter 7 case pursuant to Rule 2016(b) and Code § 329(a), was typical of those filed in other chapter 7 cases handled by Cobb when he utilized his postdated-check payment plan. In his disclosure, Cobb stated that:

> Pursuant to 11 U.S.C. § 329(a) and Fed. Bankr. P. 2016(b), I certify that I am the attorney for the above-named debtor(s) and that compensation paid to me within one year before the filing of the petition in bankruptcy, or *agreed to be paid to me,* for services rendered or to be rendered on behalf of the debtor(s) in contemplation of or in connection with the bankruptcy case is as follows:
>
> For legal services, I have agreed to accept …………...$1,194.00
> Prior to the filing of this statement I have received…...$   0.00
> Balance Due………………………………………...$1,194.00

(Doc. 1, p. 41; emphasis added.)

At the end of the disclosure – in the block where Cobb signed his name – he certified "that the foregoing is a *complete statement of any agreement or arrangement for payment to me* for representation of the debtor(s) in the bankruptcy proceeding." (Doc. 1, p. 41; emphasis added.) However, like the 528 Contract, the disclosures made no mention of the postdated checks that were intended to pay Cobb's fee.

Cobb said he did not keep records of whose checks were paid when deposited and whose checks were dishonored, and he took no steps to collect bounced checks. (Cobb Memorandum, p. 4.) Thus, if he did not keep records of dishonored checks, he must have continued to deposit later-dated checks of debtors whose earlier checks were returned by their bank unpaid. Cobb offered no estimation of what sums he had collected through his fee arrangement. Based on Cobb's disclosures of compensation (Official Forms B203),[13] and his Memorandum, it appears

---

[13] Forms B203 that stated no fees had been paid prepetition and the entire balance of the fees remained due were presumed to indicate the case utilized the postdated check arrangement.

his postdated check arrangement went on for at least two years and probably longer. While Cobb claimed he was motivated by altruism and pity for his clients who found themselves in desperate financial circumstances but without money to pay a lawyer to file their bankruptcy petition, the Court suspects – especially in light of the length of time this scheme was utilized, the number of cases Cobb filed, and the one-size-fits-all petitions (*infra* pp. 9-11) – that an accurate accounting would disclose this Rube Goldberg fee-collection contrivance was a significant money-maker.[14]

Cobb was adamant that his postdated check agreements served the greater good and, as the cliché goes, the ends justified the means. According to Cobb, his clients were desperate for bankruptcy relief but could not afford to pay his fees on a prepetition basis. Thus, Cobb stated he was willing to put his fees at risk in order to accommodate his clients' immediate need for debt relief, if not, according to Cobb, their absolute right to such relief.

Cobb dedicated a portion of his Memorandum and argument to describing anecdotal examples of creditors' heavy-handed collection techniques that were intended to intimidate Cobb's clients. While the Court had no reason to doubt these examples were essentially accurate, although perhaps embellished to make a point, it does not believe they represented any more than a few instances of creditor bellicosity and debtor naiveté, and there was no evidence that Cobb's clients were abused and harassed to any greater extent than other debtors. It should come as no surprise that when bills go unpaid, creditors will phone, write and visit, and there can

_____

[14] Rube Goldberg became famous for his cartoon drawings of complex mechanical devices which purported to perform an otherwise simple task through a series of interconnected, complex maneuvers, while the same result could be accomplished in a straightforward, uncomplicated fashion. When used as an adjective, Webster's New World College Dictionary defines "Rube Goldberg" as "designing a very complicated . . . scheme . . . laboriously contrived to perform a seemingly simple operation."

be no expectation that their demands will be conciliatory. But aggressive creditors, or even their misconduct, are a red herring this Court will not chase.[15]

A closer look at Cobb's one-size-fits-all format for serving his chapter 7 debtors belies his argument that he had nothing but good intentions and was simply making it easier for his desperate clients to get the debt relief they deserved. The Court's review of the dockets maintained in CM/ECF revealed that in all but 12 of the almost 200 chapter 7 cases handled by Cobb and his firm from January 2013 through the first week of March 2014, an application to pay the filing fee in installments was filed with each petition. (*See, e.g.,* Doc. 6.) Only 12 out of 200 debtors could afford to pay their filing fees up-front at the commencement of their cases; that figure is difficult to believe, and was called into doubt by Cobb's Memorandum wherein he admitted more of his clients probably could have paid their filing fees prepetition. (Cobb Memorandum, p. 14, n. viii.) But for Cobb's chapter 7 clients, paying the filing fee in full with the petition was almost never an option. Virtually all of his debtors paid Cobb in installments,

---

[15]Another reason promoted by Cobb to justify his postdated check agreements was this Court's refusal to allow, *carte blanche*, chapter 7 cases to masquerade as chapter 13 cases so that attorney fees may be paid through the trustee over the term of chapter 13 plans while otherwise providing no meaningful debt adjustment. The reasons this Court has refused to allow the misuse of chapter 13 cases – and the misuse of debtors by their attorneys who selfishly misguide them into attorney-fee-centric chapter 13 cases that are not otherwise justified – have been thoroughly addressed by this and other courts, and will not be repeated here. Nonetheless, there is one glaring similarity between attorney-fee-centric chapter 13 cases and Cobb's chapter 7 postdated-check scheme: They both promote the payment of attorney fees at the expense of debtors and compliance with the Code, Rules and ethical standards. *See In re Jackson,* Nos. 11–42528–JJR–13, 11–42825–JJR–13, 2012 WL 909782 (Bankr. N.D. Ala. Mar. 16, 2012), *aff'd sub nom, Brown v. Gore (In re Brown),* No. 1:12–CV–02202–RDP, 2012 WL 6609005 (N.D. Ala. Dec. 13, 2012), *aff'd,* 742 F.3d 1309 (11th Cir. 2014). In *Brown*, this Court found an absence of good faith in a chapter 13 case and plan filed strictly to finance attorney fees when the debtor would have been better served in chapter 7, but-for his inability to pay an attorney fee up front. More apropos to the issues in the instant case was the Eleventh Circuit's recognition that "[a] Chapter 7 case was thus clearly more beneficial to Brown *except for the fact that his attorney's fees could not be financed through a Chapter 7.*" 742 F.3d. at 1312 (emphasis added).

9

thus all filing fees needed to be paid the same way – simple enough. Cobb's standard procedure called for the first checks to go toward the filing fee, and because all checks were each in the amount of $100, the filing fee had to be paid over time in installments; otherwise Cobb would have had to keep records of who paid the total filing fee up-front when the petition was filed, and who was paying in installments; a simple bookkeeping chore he did not undertake. So all debtors had to fall in line, and were apparently told to sign an application certifying they did not have the wherewithal to pay the filing fee in one lump sum – whether true or not – to accommodate Cobb's assembly-line operations.[16]

Regardless of the propriety of Cobb's standardized procedure for collecting and paying filing fees, the most disturbing – and revealing – statistic is that over 50% of Cobb's chapter 7 debtors whose cases were filed from January 2013 through early March 2014 could have avoided paying any filing fees with just a little help from their attorney. More than half of Cobb's debtors who filed chapter 7 during that timeframe qualified for an *in forma pauperis* waiver of the filing fees,[17] but Cobb filed not a single *in forma pauperis* fee waiver application. That

---

[16] In the Application to Pay Filing Fee in Installments (Official Form 3A), the debtor states "I am unable to pay the filing fee except in installments." The Application is signed by the debtor and his attorney.

[17] This statistic was calculated by reviewing, via CM/ECF, the schedules filed in chapter 7 cases by Cobb and his firm from January 2013 through early March 2014.

28 U.S.C. § 1930(f) provides:

(f)(1) Under the procedures prescribed by the Judicial Conference of the United States, the district court or the bankruptcy court may waive the filing fee in a case under chapter 7 of title 11 for an individual if the court determines that such individual has income less than 150 percent of the income official poverty line (as defined by the Office of Management and Budget, and revised annually in accordance with section 673(2) of the Omnibus Budget Reconciliation Act of 1981) applicable to a family of the size involved and is unable to pay that fee in installments. For purposes of this paragraph, the term "filing fee" means the filing fee required by subsection (a), or any other fee prescribed by

Case 13-40938-JJR7    Doc 54    Filed 07/11/14    Entered 07/11/14 15:04:23    Desc Main
Document    Page 10 of 31

amounts to approximately $30,000 of his most destitute clients' money needlessly expended, and perhaps more depending on how long the postdated-check arrangement was used. Cobb literally did not bother to take a few seconds to look at his clients' income – information he needed anyway to complete their schedules – to see whether they qualified for a waiver of the filing fee – a savings of $306.00 for each debtor at today's rate. If they qualified, and most did, it would have taken no more time to file the application for a waiver of the fee than it did to file the application to pay it in installments.[18]

## ANALYSIS AND CONCLUSIONS OF LAW

### 1. Automatic Stay

In the BA's Motion and Memorandum, he alleged that Cobb's deposit of postdated checks violated the automatic stay imposed by Code § 362(a).[19] The BA argued that after a chapter 7 case was filed but before the debtor was granted a discharge – the hiatus covered by Code § 362(c)(2)(C) during which the automatic stay was in effect – Cobb's deposit of a debtor's check to pay a portion of the debt owing under the prepetition fee agreement was an effort to

---

the Judicial Conference under subsections (b) and (c) that is payable to the clerk upon the commencement of a case under chapter 7.

The official poverty line is published and easily accessed through the Internet.

[18] For an attorney so concerned about his clients' desperate financial situations and proclaimed willingness to put his fees at risk, the Court found no case in which Cobb had undertaken the representation of any debtor on an explicitly *pro bono* basis.

[19] Other than the exceptions specified in subsection (b), Code § 362(a) provides that the filing of a petition under the Code operates as a stay against virtually all efforts to collect, enforce, or perfect prepetition claims against a debtor or estate property.

11

collect a prepetition claim and, therefore, prohibited by Code § 362(a)(6).[20] To justify his conduct, Cobb relied on Code § 362(b)(11), which exempts presentment of a negotiable instrument from the automatic stay.[21] The BA countered that such a position was untenable coming from a fiduciary charged with acting in his client's best interest.

Whether Cobb is guilty of violating the automatic stay is incidental to the larger questions that need to be addressed. Nonetheless, to say the obvious, Code § 362(b)(11) was enacted to protect the integrity of the banking system, and it would be absurd to find the exception could be used to provide cover for an attorney who was attempting to avoid disclosing his clandestine arrangement for collecting fees postpetition. Accordingly, the Court concludes Cobb did violate the automatic stay when he deposited Davis's and other debtors' checks, after their petitions were filed but before their discharge; to hold otherwise would be an absurd result and one Congress never intended when § 362(b)(11) was enacted.

### 2. Discharge Injunction

The BA also alleged that when Cobb deposited debtors' checks after they received a discharge, he violated the discharge injunction imposed by Code § 524(a).[22] In response, Cobb argued that debtors could have closed their bank accounts or simply not deposited funds sufficient to cover the monthly checks, and any debtor who permitted his checks to be paid had

---

[20] Although Davis was a debtor in a chapter 13 case when Cobb deposited the check that led to the discovery of the postdated-check scheme, the automatic stay imposed under chapter 13 had the same force and effect as that in a chapter 7 case.

[21] Code § 362(b)(11) provides that "the presentment of a negotiable instrument . . ." (e.g., cashing a debtor's check) does not violate the automatic stay.

[22] Code § 524(a)(2) provides, in pertinent part: "A discharge in a case . . . operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any [debt discharged under Code § 727] as a personal liability of the debtor . . . ."

12

essentially volunteered to pay a discharged debt as allowed by Code § 524(f). (Cobb Memorandum, p. 12.)[23] The BA contended that Cobb's postdated-check scheme was intended to confuse debtors like Davis, and was structured to provide Cobb with a fabricated and illegitimate defense.

Arguing over whether Cobb's post-discharge deposit of debtors' checks was a violation of the discharge injunction, like the argument over whether the pre-discharge deposit of checks was a stay violation, should not become a distraction from the more critical issues involving Cobb's fee arrangement. That said, depositing checks after debtors received their discharge was nothing less than Cobb collecting, or, if the check bounced, attempting to collect a claim that was discharged under Code § 727. As discussed below in more detail (*infra* p.19), regardless of the slight-of-hand manipulations employed by Cobb with respect to the receipt of his clients' checks, a prepetition debtor-creditor relationship existed between Cobb and his clients, and the debt created by that relationship was discharged pursuant to Code § 727 along with virtually all other pre-petition claims against Cobb's clients.[24] Thus the injunction imposed by Code § 524(a) was violated each time a check was deposited, whether or not it was paid by the debtor's bank.

### 3. The 528 Contract

The 528 Contract – the full title of which was "Contract Required Under Code Section 528" (*supra* pp. 4-5) – prepared by Cobb for his chapter 7 clients, was a misnomer: It did not satisfy the requirements of Code § 528. Subsection 528(a)(1) provides, in pertinent part that:

---

[23] Code § 524(f) provides that "Nothing contained in subsection (c) or (d) of this section prevents a debtor from voluntarily repaying any debt."

[24] Code § 523(a) provides that some claims are not discharged, such as certain taxes, claims arising from fraud and other intentional bad acts, alimony, and child support. None of the exceptions to discharge would include fees due to an attorney for his representation of a debtor in a bankruptcy case.

13

> A debt relief agency [including a debtor's attorney] shall . . . execute a written contract with such assisted person [ i.e., the debtor] that *explains clearly and conspicuously* . . . the services such agency will provide to such assisted person; and . . . the fees or charges for such services, and *the terms of payment*.

Code § 528(a)(1)(emphasis added).

The 528 Contract did not make the least attempt to "clearly and conspicuously" explain "the terms of payment": There was absolutely no mention of the postdated checks and return envelope, the mainstays of Cobb's fee arrangement. And debtors were left to wonder whether Cobb's you-really-don't-have-to-pay-me language even applied to their checks.[25]

Paragraph 12 of the 528 Contract stated that "the Cobb Law Firm has NO RIGHT TO PAYMENT (emphasis in original) for any fees that the Debtor(s) owe the Cobb Law Firm," but said nothing about a debtor's obligation to cover his postdated checks.[26] And similarly opaque was paragraph 14 that provided "the Debtor(s) have a legal right to VOLUNTARILY REPAY (emphasis in original) the debt to Cobb Law Firm *after the Chapter 7 Bankruptcy ends*" (emphasis added). When exactly did the bankruptcy end? When Cobb completed his work on the case, when the petition was filed, or when the discharge was granted? Perhaps the case would end when it was closed by the court. Obviously, the debtors could not be expected to answer those questions with any certainty – neither can the Court – and Cobb provided no clear and conspicuous answer. Another significant question left unanswered was whether the delivery of

---

[25] Davis, who did not appear gullible or easily intimidated, testified that his understanding of the fee agreement was he had to return the checks as instructed, and he had to make sure they were paid by his bank when deposited by Cobb. The Court believes that, notwithstanding the provisions in the 528 Contract that purported to relieve debtors from their obligation to pay Cobb's fees, most of Cobb's clients left his office with the same understanding as Davis.

[26] Ala. Code 1975, § 7-3-310(b)(3) provides that ". . . if [a] check . . . is dishonored and the obligee [i.e. Cobb] of the obligation [i.e. to pay attorney's fees] for which the [check] was taken is the person entitled to enforce the [check], the obligee [i.e. Cobb] may enforce either the [check] or the obligation. . . ." In other words, the drawer's liability on a NSF check is distinct from the debt that the check was intended to pay.

14

the postdated checks to Cobb constituted a debtor's exercise of his "legal right to voluntarily repay the debt to Cobb." And once a debtor began exercising that "legal right" – and Cobb began depositing the checks – could a debtor change his mind before all checks were deposited? The very means through which Cobb was to be paid – the postdated checks – were never mentioned, much less any option for a debtor to allow his checks to bounce.[27]

---

[27] Any notion that debtors could blithely ignore the checks they gave Cobb, and let their bank systematically return them unpaid, ignores what happens in the real world. Most people, and especially those in financial distress like Cobb's clients, know a bounced check can have serious consequences, not the least of which are criminal charges. In Alabama, negotiating a worthless check is a Class A misdemeanor. *See* Ala. Code 1975 § 13A-9-13.1. Cobb would likely respond that this would never happen because he would not press charges, but that is beside the point. The important thing is what Cobb's debtors believed might happen if their checks were not paid when deposited. What they did know for certain was that they had given 15 checks to an attorney to pay his fees; a bankruptcy attorney at that, who knows about money and, in their minds, knows what to do with people who do not pay their bills. At a minimum, one would reasonably expect them to wonder what would happen to their bankruptcy case if their checks bounced: Even if Cobb did not pursue them, criminally or civilly, to collect the checks, would he continue to prosecute their bankruptcy case to a conclusion and discharge, or would he simply allow their cases to be dismissed?

When a check is returned for insufficient funds ("NSF"), banks charge a significant NSF fee. Cobb admitted he did not keep records of whose checks bounced, so a debtor could potentially face bank charges for 15 NSF checks. NSF checks are often paid by banks pursuant to overdraft protection agreements, under the assumption the customer will later deposit funds to repay the bank for covering the check, or simply through an oversight. Banks become the holder of NSF checks they elect to pay, regardless of the reason why, and as the holder they have the right to collect those checks, perhaps with costs of collection, including attorney fees. *See* Ala. Code 1975 § 6-5-285.

And banks close checking accounts when customers repeatedly bounce checks. No longer is opening a checking account available to anyone with a few dollars to deposit. Banks do not want new customers who have bad credit and a history of writing NSF checks. Thus, if you recently filed bankruptcy and are bouncing checks payable to your lawyer, banks do not want your business, and if your existing bank closes your account you probably cannot open a new account with a different bank. Without a checking account, debtors cannot use direct deposit for their paychecks or Social Security benefits. They must use expensive check cashing services (5% off the top), keep cash on hand – often large sums – to pay bills, purchase money orders, or incur cash-wiring fees (e.g., Western Union). NSF checks are reported to credit rating agencies. This would create a problem for anyone, but especially those who are trying to get a fresh financial start and rebuild their credit after going through bankruptcy.

15

#### 4. Postdated Checks to Pay Attorney's Fees

Actually there is some authority approving the postpetition payment of attorney's fees by chapter 7 debtors via postdated checks. One example is *Gordon v. Hines (In re Hines)*, 147 F.3d 1185 (9th Cir. 1998), cited by both Cobb and the BA. In *Hines,* the court fabricated from whole cloth a "doctrine of necessity" and blessed a postdated-check fee agreement. However, there is a critical distinction between the fee arrangement examined in *Hines* and that employed by Cobb: The debtor's attorney in *Hines* ". . . *properly disclosed his fee arrangement* to the bankruptcy court pursuant to [Code] Section 329 and Federal Rule of Bankruptcy Procedure . . . 2016(b)." *Id*. at 1187(emphasis added).

The judicial "doctrine of necessity" invented by the Ninth Circuit in *Hines* has not been widely accepted; the Seventh Circuit explained its reasons for rejecting *Hines* thusly:

> The three lawyers contend that reading § 727 this way would force the most destitute of debtors to forego legal assistance, because counsel neither could be paid in advance (the norm for Chapter 7 cases) nor could collect after the case ends. The bar therefore would shun these debtors, depriving them of the Code's benefits. That argument about what makes for good public policy should be directed to Congress; the judiciary's job is to enforce the law Congress enacted, not write a different one that judges think superior. *See Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 460-62, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002*). Cf. United States v. Kras*, 409 U.S. 434, 93 S.Ct. 631, 34 L.Ed.2d 626 (1973) (filing fee that makes it possible to be "too poor to go bankrupt" must be implemented). . . .

> The *Hines* majority wrote that it thought the Code as written (and as implemented in *Biggar*) is unsatisfactory as a matter of public policy, and it decided to do a little surgery under what it called a "doctrine of necessity." *See*

---

For an in-depth review of problems facing the "unbanked" population, and how they are blacklisted for writing NSF checks – often just one – see Jessica Silver-Greenberg and Michael Corkery, *Bank Account Screening Tool is Scrutinized as Excessive*, N.Y. TIMES, June 16, 2014 (New York ed.), at B1; and see Danielle Douglas, *Why a Guy Making $100,000 a Year Can't Get a Bank Account*, WASHINGTON POST, June 19, 2014, http://www.washingtonpost.com/blogs/wonkblog/wp/2014/06/19/why-a-guy-making-100000-a-year-can't-get-a-bank-account/.

147 F.3d at 1190-91. Like Judge Barliant, who concluded that *Hines* is wrongly decided, we do not conceive revision of the Code as a proper part of the judicial job. The Bankruptcy Code is a complex compromise among debtors and different kinds of creditors; tilting it to help one of these interests is unwarranted. Attorneys compete with other creditors, such as banks, credit card issuers, supermarkets, auto dealers, colleges, spouses, and children; some of these have obtained protection under § 523 and others have not. Judges are not entitled to override the legislative approach with a lawyer-centric public policy that puts members of their own social class higher in the priority list at the expense of other creditors, or of the debtors themselves.

*Bethea v. Robert J. Adams & Associates*, 352 F.3d 1125, 1127-28 (7th Cir. 2003).

There are other reported decisions that scrutinize the use of postdated checks to pay a chapter 7 debtor's attorney fees, but the Court found none that approached the intricacy, breadth and duration of Cobb's operation for a two-lawyer firm. *See, e.g., Hines*, 147 F.3d 1185 (one case with two postdated checks); *In re Waldo*, 417 B.R. 854 (Bankr. E.D. Tenn. 2009) (discussed *infra*); *In re Lewis*, 309 B.R. 597 (Bankr. N.D. Okla. 2004) (one case with one postdated check, with the attorney admitting to having taken similar checks in two other cases); *In re Shell*, 312 B.R. 431 (Bankr. M.D. Ala. 2004) (one case with five postdated checks); *In re Lawson*, 437 B.R. 609 (Bankr. E.D. Tenn. 2010) (same law firm as in *Waldo*, *supra*; fifteen cases and possibly others, five to seven postdated checks each, some made by third parties in an attempt to circumvent *Waldo*; firm disgorged additional $123,742.00 based on *Waldo*); *In re Walton*, 454 B.R. 537 (Bankr. M.D. Fla. 2011) (discussing similar arrangement with large law firm and unspecified number of cases).

The court in *In re Waldo*, *supra,* examined seven cases, but noted that the law firm had used the postdated check arrangement as a matter of routine for many of its chapter 7 cases. While the law firm in *Waldo* went further than Cobb in collecting its fees after the discharge was entered (telephoning and sending collection letters in addition to continuing to deposit the checks), the arrangement was otherwise strikingly similar. So too were the problems with

17

disclosure.  The court in *Waldo* found that disgorgement was the appropriate remedy, especially in light of: the law firm's inaccurate compensation disclosures; failure to list itself as a creditor on debtors' schedules; violations of the automatic stay and discharge injunction; failure to advise clients their obligations to the firm were dischargeable; and the conflict of interest created by accepting postdated checks in the first place.  The court did not equivocate: "'It is not proper for a bankruptcy attorney to accept postdated checks from a chapter 7 debtor client.'" *Id.* at 886 (*quoting In re Newkirk*, 297 B.R. 457, 461 (Bankr. W.D.N.C. 2002)).   Moreover, the court pointed out that the initial disclosures were inaccurate and the amended disclosures were filed only after the issue was raised by the U.S. Trustee, and even then the amended disclosures said nothing about postdated checks.  "For these reasons alone, the court would have cause to deny fees" and was "more than justified" when the inaccurate disclosure was combined with the discharge violations and other problems with the postdated check arrangement.  417 B.R. at 895.

If Cobb had only disclosed in sufficient detail his postdated-check fee agreement when he filed his first case under that arrangement, instead of relying on stealth for the last two years, and perhaps longer, there now would be no reason to question his motives or consider the extent of his misdeeds. And the only thing in jeopardy would be his fees in that one case.  If this Court had disallowed his newly introduced fee arrangement in that first case, he could have taken an appeal and perhaps persuaded an appellate court to adopt the *Hines* doctrine of necessity, or some other theory that would allow postpetition payment of attorney fees in chapter 7 cases – with or without postdated checks – but in all such cases with full disclosure.

18

### 5. Failure to Adequately Disclose

Cobb was unquestionably a prepetition creditor of Davis and his other chapter 7 clients despite not having actual possession of their postdated checks at the moment he filed his compensation disclosures, and the debtors' schedules and statements of financial affairs.[28] Although unnecessarily convoluted, the essence of the bargain between Cobb and each of his chapter 7 clients was simple enough: The *quid pro quo* for Cobb's filing a chapter 7 case was the debtor's commitment to return the postdated checks, with the expectation that they would be deposited monthly, one by one, to pay Cobb's fee in installments. This arrangement created a textbook debtor-creditor relationship in which one party performed a service in return for the other's commitment to pay an agreed-upon sum over time. Despite the existence of this relationship fashioned before the commencement of the case and continuing thereafter for over 15 months, Cobb failed to list himself as a creditor on his debtors' Schedules F[29] and he made no mention of the postdated-check agreement in his debtors' Statements of Financial Affairs[30] or elsewhere.

---

[28] Cobb admitted he was a creditor of his chapter 7 clients in the 528 Contracts, where the "debt owed to the Cobb Law Firm" and other statements to that effect were used several times. Moreover, Cobb's responses to the BA's accusations that he violated the automatic stay and discharge injunction were based on exceptions that exonerate creditors who collected, or attempted to collect prepetition debts owed by a debtor.

[29] The instructions to Schedule F (Official Form 6F) (*see, e.g.,* Doc. 1, pp.16-18) require the debtor to "State the name, [and] mailing address . . . of all entities holding unsecured claims without priority against the debtor or property of the debtor, as of the date of filing of the petition."

[30] Paragraph 9 of the Statement of Financial Affairs (Official Form 7) (*see, e.g.,* Doc. 1, pp. 26-33) instructs a debtor to "List all payments made or property transferred by . . . the debtor to any person, including attorneys, for consultation concerning . . . relief under the bankruptcy law or preparation of a petition in bankruptcy within one year immediately preceding the commencement of this case."

19

The absence of disclosures was not limited to documents filed with the Court that addressed claims against debtors and their financial affairs. Indeed, Cobb's own disclosures and certifications as debtors' counsel, in which he was required to divulge his fee agreements, also failed to mention the postdated checks.

Attorneys who represent debtors in bankruptcy cases must comply with the disclosure requirements mandated by Code § 329(a) and Rule 2016(b), which, in pertinent part, provide that:

> Any attorney representing a debtor in a case under this title, or in connection with such a case … shall file with the court a statement of the compensation paid or *agreed to be paid*, if such payment or agreement was made after one year before the date of the filing of the petition, for services rendered or to be rendered in contemplation of or in connection with the case by such attorney, and the source of such compensation (emphasis added).

Code § 329(a).

> Every attorney for a debtor . . . shall file . . . the statement required by § 329 of the Code . . . . A supplemental statement shall be filed and transmitted to the United States trustee [or, where applicable, the BA] within 14 days after any payment or agreement not previously disclosed.

Rule 2016(b).

Compliance with Code § 329(a) and Rule 2016(b) may be achieved only when attorneys *fully* and *accurately* complete a Disclosure of Compensation, Official Form B203 (*see, e.g.,* Doc. 1, p. 41). Form B203 filed by Cobb in Davis's case was typical of those he filed in other chapter 7 cases where the postdated-check payment plan was utilized. As previously mentioned (*supra* p. 7), in his disclosures Cobb certified "that the compensation paid to me within one year before the filing of the petition in bankruptcy, or *agreed to be paid to me,* for services rendered or to be rendered on behalf of the debtor(s) in contemplation of or in connection with the bankruptcy case is as follows . . ." (emphasis added). Thereafter he disclosed the amount he agreed to accept for

Case 13-40938-JJR7    Doc 54    Filed 07/11/14    Entered 07/11/14 15:04:23    Desc Main
Document    Page 20 of 31

his services – $1,196 in Davis's case; the amount paid before the case was filed – i.e. $0.00; and the balance due was shown as the full amount of his fee. But that was not what Cobb and his clients had agreed. The 528 Contract stated that the debtors "do not have to pay the Cobb Law Firm either during the Chapter 7 Bankruptcy or after the Chapter 7 Bankruptcy is over." Thus, there was a conflict between Cobb's disclosure showing the full amount of his fee was due and the 528 Contract that said nothing further had to be paid. A similar dichotomy existed between Cobb's fee disclosure, showing the full amount was unpaid, and Schedule F that did not list Cobb as a creditor, not even a creditor whose claim was contingent, unliquidated or disputed – designations available on Schedule F by simply checking a box. Regardless of whether you hang your hat on Form B203 (100% remained unpaid), the 528 Contract (nothing due except voluntary payment), or the undocumented "understanding" between Cobb and his clients (commitment to return postdated checks), there was never a disclosure made to the Court or the debtors that explained, clearly and conspicuously, the terms of payment vis-à-vis the postdated checks. Cobb's disclosures on Form B203 made no mention of (i) the postdated checks that were intended to pay his fee, (ii) the debtor's commitment to return the checks when notified by Cobb, (iii) Cobb's agreement to work without pay unless the debtors volunteered to pay all or a portion of his fees, and (iv) whether Cobb's concession to forego payment extended to the checks.

To satisfy Code § 329(a), Rule 2016 and Official Form B203, every material detail of a lawyer's fee arrangement with his client must be disclosed in simple language that leaves nothing to the imagination. Counsel's disclosures must tell the entire story of how fees have been or will be paid. The Code and Rules intend for these disclosures to be sufficient, complete, and understandable in and of themselves, leaving nothing untold that requires further inquiry.

21

Disclosures that are intentionally incomplete are tantamount to false disclosures, and in some instances, as here, even worse because they mislead the court and parties in interest. The bankruptcy court in *In* re *Lewis,* 309 B.R. 597 (Bankr. N.D. Okla. 2004) aptly described the extent of disclosure required:

> Counsel for a debtor "has an affirmative duty to disclose all its connections with the debtor, including fees paid in the year preceding the bankruptcy filing." *See In re Saturley*, 131 B.R. 509, 516 (Bankr.D.Me.1991) (emphasis in original). "Counsel's fee revelations must be direct and comprehensive. Coy or incomplete disclosures which leave the court to ferret out pertinent information from other sources are not sufficient. Anything less than the full measure of disclosure leaves counsel at risk that all compensation may be denied." *Id.* at 517 (citations omitted). The information is to be placed in the form required under Bankruptcy Rule 2016(b); a court is not required to look in the statement of affairs or in other pleadings in the case to determine the relationship between debtor and his or her attorney. *See id.; see also In re Prudhomme*, 43 F.3d 1000, 1003 (5th Cir.1995) (ordering disgorgement where retainer was disclosed in statement of affairs, but not in Rule 2016 statement); *see also In re Smitty's Truck Stop, Inc.*, 210 B.R. at 849 (same).

*Id*. at 605.

Cobb asserted that, because he had not yet deposited more of the checks in his possession than were needed to cover payment of the filing fee, he had taken no property or payment from the debtor that needed to be disclosed under Rule 2016(b). In eschewing this potential justification, the *Lewis* court again bears quoting:

> The argument would go something like this: "well, judge, since I can't cash the check until some future date (the date on the check), the check has no value at the time it was received, and thus I was not required to tell you or anyone else of its existence." Had the argument been made, it would have been flatly rejected. Such a reading of the disclosure requirements would endorse the exact manner of "coy or incomplete" disclosures which this and all other courts have found wanting. To put it simply, post-dated checks are property, and receipt of any and all property by counsel for a debtor in payment of or as security for payment of fees must be disclosed. Anything less is a violation of the spirit and the letter of § 329 and Bankruptcy Rule [2016].

*Id.* at 606-07 (citations omitted).

What's most disturbing about Cobb's fee-collection paradigm is it was custom made for the purpose of avoiding detection, and repeatedly utilized in a distinct discipline of jurisprudence – bankruptcy – that, more than most, relies on full and honest disclosures by its participants and their lawyers to effectively function and retain credibility. The Court agrees with the BA's assertion that Cobb's deficient disclosures "[were] not an oversight, but [were] done to strategically avoid raising any red flags with the Court, the BA, the trustee or creditors." (BA's Memorandum, p. 7.) In other words, the postdated-check scheme was contrived to deceive the Court and parties in interest.

While examining a similar, albeit less secretive, postdated-check fee arrangement, the *Lewis* court explained the damage done when bankruptcy attorneys resort to chicanery:

> In many ways, this case exposes the fragility of the bankruptcy system. Ours is a system built upon the principle of full and candid disclosure. Debtors must truthfully and accurately list all of their assets and all of their liabilities. Counsel must honestly and completely disclose the full nature of their relationship with their clients. Creditors must honestly and correctly calculate and state their claims. It is these disclosures which allow the public to have confidence in the system, and hopefully to believe that bankruptcy laws exist to protect the "honest but unfortunate" debtor, that those creditors who receive funds receive only their just and proper share, and that those who represent debtors perform a service beyond satisfaction of their selfish avarice. Without those beliefs, public confidence in the bankruptcy process, and perhaps far more, is placed at risk.
>
> The fragility of the system is found in the fact that many of the required disclosures are difficult if not impossible to police, at least in a cost-effective manner. Often times, the problem is discovered by happenstance. Such was the case here. . . . We cannot rely upon such circumstances in every case. Instead, we must rely upon the integrity and expertise of those who seek to practice in the bankruptcy arena. Where either of those qualities are found to be lacking, swift and decisive action must be taken to enforce the operative provisions of the Bankruptcy Code. This is not an area where the Court will engage in or tolerate a game of "catch me if you can," or allow "I guess I did not know better" to be a palatable excuse. . . .
>
> Disclosure of compensation arrangements between debtors and their counsel is an essential part of the bankruptcy process. As noted in a leading treatise on the subject, "[c]ourts have long recognized that the debtor is in a

23

vulnerable position and is highly dependent on its attorney and therefore will be reluctant to object to the fees of the attorney." *Citing* 3 Collier on Bankruptcy ¶ 329.01 at p. 329–3 (Alan N. Resnick & Henry J. Sommer, eds., 15th rev. ed.2002) (citations omitted).

*Id*. at 602-04.

The *Lewis* court quoted from the debtor's testimony, which established that the debtor in that case did not want to make his attorney mad or get his attorney in trouble, and that he was desperate to save his home at the time he agreed to the postdated check arrangement: "a chilling reminder of such vulnerability, dependency, and reluctance." *Id*. at 604. Davis's testimony was similar in this case. The same desperate-debtor traits Cobb cited in support of his scheme are the very traits that make the scheme so reprehensible. "It is for this reason that the attorney, and not the client, is charged with the knowledge of the operative provisions of the Bankruptcy Code and the canons of ethics when it comes to the matter of fees and disclosure. When something is amiss in this area, the debtor/client is probably the least likely person to know." *Id*.

Any notion that the checks were not "property" because they were postdated is nonsense. Even though the checks were postdated, they had value. Many debt instruments (e.g., U.S. Treasury bonds, commercial paper) commit to pay a sum of money on a future maturity date, and without question they have value. The same is true for the postdated checks given to Cobb. *See* Ala. Code 1975, § 7-3-113 ("An instrument may be antedated or postdated."). Equally fallacious is any argument that there was no obligation to disclose the checks because they were not physically "transferred" until mailed back to Cobb's office after the case was filed. Such an argument is no more than a shell game of "find-the-checks" – a game this Court refuses to play. Cobb was given his clients' checks at their initial meeting – at least long enough to stamp on each the amount to be paid and his name as payee (*supra* p. 3), and then stuff them in a return envelope with postage affixed. Cobb's clients left his office after having made a commitment to

Case 13-40938-JJR7    Doc 54    Filed 07/11/14    Entered 07/11/14 15:04:23    Desc Main
Document      Page 24 of 31

return the checks when prompted by a phone call from Cobb. From the initial meeting between Cobb and his clients, the checks were always earmarked to pay Cobb's fee. To say no property was transferred to Cobb prepetition ignores the essence of the fee arrangement, elevates form over substance, and most critically, would legitimize Cobb's shell-game at the expense of compliance with the disclosure requirements of the Code and Rules. Regardless, even if Cobb's timing argument had merit, an amended disclosure was required immediately upon receipt of the check-filled envelope pursuant to Rule 2016(b). The convoluted and subversive procedures established by Cobb in his efforts to avoid having the checks in hand at filing and to avoid having deposited more than the filing fee pre-discharge – for the purpose of hiding from the Court and others his actual fee arrangement – made his conduct more egregious than that of the attorney in *Lewis*. Such gamesmanship in an effort to avoid full disclosure should not be countenanced by any court.[31]

---

[31] The BA also maintains that the postdated-check arrangement created a conflict of interest that violated the duty of loyalty owed by Cobb to his clients under the Alabama Rules of Professional Conduct, applicable here by virtue of Local Rule 2090-1 of the U.S. Bankruptcy Court for the Northern District of Alabama and Local Rule 83.1(f) of the U.S. District Court for the Northern District of Alabama. Rule 1.7(b) of the Alabama Rules of Professional Conduct provides that:

> b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the *lawyer's own interests* (emphasis added). . . .

The comment following Rule 1.7 explains that:

> Loyalty to a client is also impaired when a lawyer cannot consider, recommend or carry out an appropriate course of action for the client because of the lawyer's other responsibilities or interests. . . . The lawyer's own interest should not be permitted to have adverse effect on the representation of a client.

The postdated check arrangement put Cobb's own interest in getting paid in direct conflict with his client's interest in obtaining a discharge from all prepetition debts. Thus, Cobb was not disinterested, and in Davis's case was the second-largest, albeit

25

## 6.  Untrue & Misleading Statements - Code §§ 526, 707 & Rule 9011

Cobb's fee arrangement also violated the constraints and obligations imposed on bankruptcy counsel by Code §§ 526 and 707, which in pertinent part provide that:

> (a) A debt relief agency [including an  attorney] shall not—
>
> *   *   *   *
>
> (2) make any statement, or counsel or advise any assisted person or prospective assisted person to make a statement in a document filed in a case or proceeding under this title, *that is untrue or misleading*, or that upon the exercise of reasonable care, should have been known by such agency to be untrue or misleading.

Code § 526(a)(2) (emphasis added).

> (C)  The signature of an attorney on a petition, pleading, or written motion shall constitute a certification that the attorney has—
>
>> (i) performed a reasonable investigation into the circumstances that gave rise to the petition, pleading, or written motion; and
>> (ii) determined that the petition, pleading, or written motion—
>>
>>> (I) *is well grounded in fact . . . .*
>
> (D)     The signature of an attorney on the petition shall constitute a certification that the attorney has *no knowledge* after an inquiry *that the information in the schedules filed with such petition is incorrect*.

Code § 707(b)(4)(C), (D)(emphasis added).

And in the same vein, Rule 9011 provides that:

> (b)  *Representations to the Court.*  By presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion, or other paper, an attorney . . .  is certifying that to the best of the

---

unscheduled, unsecured creditor. (*See* Doc. 1, pp. 16-18, Sch. F.)  Moreover, to hide his fee arrangement from the Court, creditors and trustee, Cobb omitted himself as a creditor on his clients' schedules, and then allowed them to sign declarations under penalty of perjury that those schedules were "true and correct" – declarations Cobb knew were not accurate. (*See* Doc. 1, p. 25.)  Thus, Cobb ignored his duty to not file schedules for his clients that he knew were incomplete and misleading for the purpose of promoting his own interest in remaining *incognito* as a creditor.

[attorney's] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, –

 (1) *it is not being presented for any improper purpose*, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation [and] . . .

 (3) the allegations and other factual contentions have *evidentiary support* . . . .

Rule 9011(b).

Cobb intentionally omitted himself as a creditor on his clients' schedules and failed to adequately disclose his fee arrangements on Form B203. Thus, contrary to the requirements of Code §§ 526(a) and 707(b), he filed documents with the Court that he knew were untrue and misleading, and not well grounded in fact, and when he instructed his clients to sign their schedules, he was counseling them to unknowingly do likewise. Furthermore, and contrary to Rule 9011, the same flawed schedules and compensation disclosures were filed by Cobb for an improper purpose: to conceal the duplicity of his fee agreements from the Court, the trustee and creditors – otherwise, why the intricate and complicated steps to keep the agreements under-wraps?[32]

## <u>SUMMARY</u>

Cobb's slight-of-hand technique for collecting attorney fees in chapter 7 cases was a ruse constructed to avoid detection but at the same time reasonably certain to extract postpetition and

---

[32] Additionally, Cobb's fee arrangement was structured in a manner that caused his clients to unwittingly violate the terms of their Applications to Pay Filing Fee in Installments – prepared and signed by Cobb. In their applications debtors stated that "Until the filing fee is paid in full, *I will not make any additional payment or transfer any additional property to an attorney* or any other person *for services in connection with this case.*" (emphasis added). Similarly, Rule 1006(b)(3) provides that "All installments of the filing fee must be paid in full before the debtor . . . may make further payments to an attorney . . . in connection with the case." Under Cobb's way of doing business, he required his debtors to transfer property to him, i.e., the postdated checks, soon after the installment application was signed but, contrary to the terms of the applications and Rule 1006(b), before the filing fees were paid in full.

postdischarge payments from his clients who were left ill-informed about their obligations to cover the series of checks they delivered to their lawyer in a cloak-and-dagger fashion.[33] Debtors, judges, creditors and trustees could read every word of (i) the 528 Contracts crafted, ostensibly at least, by Cobb for the purpose of "clearly and conspicuously" disclosing the details of his fee arrangements, (ii) Cobb's compensations disclosures on Forms B203, and (iii) his debtors' schedules and statements of financial affairs, and have not an inkling of how Cobb was actually collecting his fees. Cobb's paradigm violated the automatic stay and discharge injunction, but most critically it failed to meet the professional disclosure requirements imposed on lawyers by the Code and Rules. Furthermore, Cobb, while acting as his clients' fiduciary and an officer of this Court, intentionally prepared incomplete schedules and statements of financial affairs for his clients, and deficient disclosures of compensation for himself, to conceal the true payment arrangement with his clients. Thus, Cobb was *knowingly* complicit with his *unknowing* clients in filing false documents with the Court, and did so for his personal gain and to grab a market advantage over lawyers who abided by the Code, Rules, and cannons of ethics.[34] Cobb's failure to file applications for *in forma pauperis* waivers of filing fees for more than 50% of his

---

[33] The public and, to an extent, non-bankruptcy lawyers and judges, are suspect when it comes to the transparency and fairness of the bankruptcy process and its participants, including debtors, and bankruptcy lawyers and judges. Outsiders, for the most part, do not understand bankruptcy jurisprudence, and believe it benefits only those insiders who know how to play a complex game whose rules were intentionally drafted and interpreted to intimidate the unschooled. Cobb's postdated-check fee arrangement promotes such suspicion and stereotype. And one can only image the impression Cobb's clients had of the bankruptcy process they were about to participate in when they left Cobb's office with an envelope full of postdated checks after having been instructed to wait for a phone call from Cobb's office before mailing it back – seeking relief under Title 11 should not bring to mind visions of *Mission: Impossible*.

[34] "[The attorney] is one of the coterie of lawyers who advertises in the media for personal bankruptcy business, with the ability of the debtor to pay fees in installments being part of his sales pitch. That 'pay me later' representation seems to give him a competitive edge [over lawyers who do not offer] credit terms to their prospective clients." *Hines*, 147 F.3d at 1188, n. 4.

clients who appeared qualified for the waiver – instead of the pervasive applications to pay such fees in installments – revealed he was running a one-size-fits-all bankruptcy mill, designed to attract clients with pay-me-later terms.

For the bankruptcy process to function as intended by Congress, disclosures by debtors and their attorneys must be accurate and complete. There can be no secrets, half-truths, coy responses, or limited and inadequate disclosures that require cross-examination to get the full story. "Neither the trustee nor the creditors should be required to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight." *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 110 (1st Cir. 1987) (citing *Matter of Mascolo*, 505 F.2d 274, 278 (1st Cir. 1974), and *In re Tabibian*, 289 F.2d 793, 797 (2d Cir. 1961)). It all starts with the attorneys; they are charged with knowing the Code, Rules, and ethical cannons. When attorneys resort to trickery to skirt disclosure requirements, their clients recognize that something unsavory is afoot. Cobb's clients may not have known the exact purpose of the postdated-checks-and-return-envelope routine, but they were shrewd enough to know Cobb was up to something he wanted kept under the table, and that something lacked the bona fides you would expect from a lawyer who was guided by ethical principles rather than his pocketbook. Indeed, Cobb's conflict of interest was glaring: There was no incentive for him to impress upon his clients the importance of disclosing all their income and assets; after all, anything that was left undisclosed would not go to creditors, but potentially would be available to pay the checks Cobb would soon be depositing after the dust settled. The more that went undisclosed, the better chance those checks would be paid when deposited.

The Court needs to hear more from Cobb and the BA before deciding the consequences for Cobb's misconduct in Davis's chapter 7 case and other cases that involved the same

undisclosed fee-collection scheme. Accordingly, by separate order, Cobb will be required to furnish the Court and BA with detailed information regarding his fees and the expenses charged in all chapter 7 cases filed by Cobb, his firm and any lawyer with his firm, from January 1, 2012 through the date of the order.[35] After receipt of this information, the Court will determine

---

[35] The order entered in furtherance of this Opinion will require Cobb to, *inter alia*, furnish the Court and the BA with the following information, verified under penalty of perjury as to accuracy and completeness (not just to the best of Cobb's knowledge and belief), for each case filed under chapter 7 of the Code by Cobb, his firm or any lawyer with his firm, from January 1, 2012 through the date of the order (collectively, the "Suspect Cases"):

1. the debtors' names, case numbers and petition dates;

2. a detailed explanation of the agreement or arrangement for the payment of attorney fees and expenses; and if in writing, copies of such agreements or arrangements;

3. the amount of attorney fees charged, the amount of fees actually collected, the method of payment (e.g., check, money order, cash), broken down by amount and date of each payment, and if paid by other than a debtor, the name of the payor;

4. a detailed description of the expenses charged by, reimbursable to, or paid through Cobb, his firm, or any lawyer with his firm; the amount of each such expense; the amounts actually collected with respect thereto, and the method of payment (e.g., check, money order, cash), broken down by amount and date of payment, and if paid by other than a debtor, the name of the payor;

5. for each of the Suspect Cases in which undeposited checks were returned to debtors, the date the checks were returned, the respective amounts of each check returned (not just the total), whether any of those debtors have since paid any fees to Cobb or his firm, and if so, a detailed breakdown of such payments showing dates and amounts, and how paid (e.g., check, money order, cash) and if paid by other than the debtor, the name of the payor;

6. for each of the Suspect Cases in which a debtor has requested a refund of previously paid attorney fees, the name of such debtors, their case numbers, the amount refunded and the date such refund was made; and

7. calculations demonstrating whether or not the respective debtors would have been eligible at the time their petitions were filed for *in forma pauperis* waivers of their filing fees, broken down by case number, debtors' names, family size, income less any non-cash government assistance such as food stamps, applicable income level

30

whether disgorgement of fees and expenses, and imposition of sanctions are appropriate, and if the Court finds disgorgement or sanctions, or both, appear justified, it will order Cobb, his firm and other lawyer with the firm, to show cause why the same should not be ordered and imposed. The BA will be expected to advocate his position at any show-cause hearing.

Done and dated this 11th day of July 2014.

/s/ James J. Robinson
James J. Robinson
U.S. Bankruptcy Judge

---

that would be 150% of the poverty line as of the petition date, and amount of filing fees actually paid.

In the order, the BA will be directed to review and audit the information provided by Cobb, and Cobb's methodology used to gather such information, and report to the Court whether the BA considers such information to be accurate, complete, and credible. And finally, the order shall allow the BA to examine under oath and depose Cobb, other lawyers with his firm, and the firm's employees regarding the Suspect Cases, the information required to be provided by Cobb pertaining to the Suspect Cases, and other matters discussed in this Opinion and said order.