# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ALABAMA
### EASTERN DIVISION

In re:

CLYDE L. DAVIS, JR.,

        Debtor.

Case No. 13-40938-JJR

Chapter 7

## SECOND MEMORANDUM OPINION

### I – Introduction and Background

This is the second opinion ("Second Opinion") the Court has written concerning the surreptitious arrangement conjured up by debtor's counsel to collect attorney fees and expenses from the debtor in this case and from debtors in at least 291 additional cases. The findings in the earlier opinion (Doc. 54, the "First Opinion")[1] described in detail the postdated check scheme used by attorney Leroy A. Cobb ("Cobb") and the Cobb Law Firm, LLC (the "Law Firm") to collect fees in the great majority of their chapter 7 cases filed from January 1, 2012 through July 11, 2014. The Law Firm is a two-lawyer firm comprised of Cobb and Bethany Cobb Courville ("Courville").

Cobb's routine went like this: When prospective debtors called the Law Firm for an appointment, they were told to bring their check books with them. During their initial visit they were instructed to sign fifteen checks; on each check, Cobb stamped $100 as the amount payable, and his name as payee. The checks were postdated for fifteen consecutive months, with the first dated approximately one month after the visit. Cobb put the checks into an envelope addressed to his Law Firm with prepaid postage affixed. The envelope containing the checks was returned to the prospective debtor who was told to mail it back as soon as the Law Firm

---

[1] Unless otherwise defined herein, terms defined in the First Opinion shall continue to have the same meanings when used in this Second Opinion.

Case 13-40938-JJR7   Doc 101   Filed 04/07/15   Entered 04/07/15 13:25:32   Desc Main
Document     Page 1 of 25

called and told him his bankruptcy case had been filed. According to Cobb, virtually all debtors followed his instructions. This attorney fee payment arrangement was not disclosed anywhere – not in the contracts between the Law Firm and the debtors as mandated by Code § 528; not in the fee disclosures filed by the Law Firm as required by Code § 329 and Rule 2016; and not in the schedules or statements of financial affairs filed by the Law Firm in the debtors' cases. Cobb's and Courville's excuse for not disclosing their postdated check arrangement was that the debtors had the option of not returning their postdated checks, although that option was likewise never disclosed, at least not in writing.

In the First Opinion, the Court concluded that "Cobb's slight-of-hand technique for collecting attorney fees in chapter 7 cases was a ruse constructed to avoid detection but at the same time reasonably certain to extract postpetition and postdischarge payments from his clients who were left ill-informed about their obligations to cover the series of checks they delivered to their lawyer in a cloak-and-dagger fashion." (First Opinion 27-28.) The additional evidence – discussed below – provided to the Court by Cobb and the BA reinforces that conclusion and warrants the imposition of sanctions against both Cobb and Courville.

## II – Cobb's Accounting and BA's Audit

An Order (Doc. 55, the "First Order") conforming to the findings and conclusions of the First Opinion directed Cobb and the Law Firm to provide the Court and the BA with an accounting and other information regarding the postdated checks delivered by debtors to Cobb to pay his fees and expenses in the Suspect Cases. The BA was instructed to review and audit that information, and report his findings to the Court. The First Order specifically stated that the information provided by Cobb was to be "verified under penalty of perjury as to accuracy and completeness (not just to the best of Cobb's knowledge and belief) . . . ." (First Order 1.)

Cobb filed a Response (Doc. 74, "Cobb's Initial Response"), and although it purported to provide the required information, its accuracy and completeness were not verified as mandated by the First Order. Cobb's Initial Response made reference to "seven spreadsheets that lay out the requested information" and on the last page, above Cobb's signature, he declared "under penalty of perjury that the enclosed records are an accurate and a complete reflection of the *records of Cobb Law Firm, LLC*." (Doc. 74, emphasis added.) As further discussed below, Cobb admitted that his Law Firm's records were woefully deficient, if they existed at all. Therefore, declaring that the source of the information was the Law Firm's records was tantamount to an admission that the information was neither accurate nor complete. Cobb's oblique, circuitous declaration, like his fee collection scheme, is yet another example of his unwillingness to abide by imperatives, whether embodied in the Code, the Rules or this Court's order.

Following his review of Cobb's Initial Response, the BA filed his Report to Court (Doc. 82, the "BA's Report"), in which he noted several deficiencies and ambiguities in Cobb's Initial Response. The BA's criticism of Cobb's Initial Response, along with Cobb's failure to verify the accuracy and completeness of the information he provided, convinced the Court that the information in the Initial Response was probably not complete or accurate as required by the First Order. Nonetheless, the BA's Report analyzed and better organized the information supplied by Cobb. In particular, Exhibits A-1 and A-2 to the BA's Report identified the Suspect Cases that utilized the Law Firm's postdated checks arrangement, and set forth the amount charged by the Law Firm and the amount collected in those cases. Exhibits D-1 and D-2 identified debtors in postdated check cases who had checks returned due to insufficient funds, and disclosed the number of bounced checks and their amounts. Finally, Exhibit E identified debtors whose limited incomes made them eligible for *in forma pauperis* waivers of their filing

fees. Neither Cobb nor Courville challenged any of the information compiled in the BA's Report, probably because, for the most part, it was taken from information initially supplied by Cobb.

### III – Show Cause Order and Responses

After receiving Cobb's Initial Response and the BA's Report, the Court issued an Order to Appear and Show Cause (Doc 84, the "Show Cause Order") in which the BA was ordered to file his recommendations regarding what sanctions, if any, should be imposed against Cobb, and separately against Courville, as a consequence of the Law Firm's postdated check scheme, and ordered Cobb and Courville to show cause why sanctions as recommended by the BA, or as may be fashioned by the Court, should not be imposed. In response to the Show Cause Order, the BA filed his Report to Court Regarding Sanctions (Doc. 86, the "BA's Sanctions Report") and Cobb and Courville filed their Response (Doc. 92, "Sanctions Response").[2]

Cobb's and Courville's Sanctions Response attempted to draw distinctions between the postdated check scheme utilized by their Law Firm and similar fee arrangements described in the reported decisions in which disgorgement of fees was imposed as a sanction. The Law Firm's scheme was similar in many respects, although it did not exactly follow the templates of other postdated check fee arrangements criticized in the reported decisions. The Law Firm's scheme was more covert and complex, was utilized over a longer period of time, and used in many more

---

[2] For the most part, the raw data contained in the BA's Report and the BA's Sanctions Report regarding the postdated check cases came from information originally supplied by Cobb, and from Cobb's deposition, a copy of which was attached as an exhibit to the BA's Report ("Cobb deposition"). While Cobb and Courville do not agree that either should be sanctioned, they did not dispute the accuracy of the information reported by the BA. Thus, the Court relied on the data reported in the BA's Report and the BA's Sanctions Report, including the exhibits thereto and Cobb's deposition, for many of the additional findings of fact set forth in this Second Opinion. To the extent there were differences or conflicts between Cobb's Initial Response and the BA's Report, and between the BA's Sanctions Report and the Sanctions Response submitted by Cobb and Courville, the Court found the two reports from the BA far more credible.

Case 13-40938-JJR7    Doc 101    Filed 04/07/15    Entered 04/07/15 13:25:32    Desc Main
Document    Page 4 of 25

cases before it was discovered. But the mystery surrounding the checks, including how and when they were delivered, and the ambiguity regarding the debtors' liability to cover their checks, were indeed unique. If anything, these differences made the Law Firm's practice more egregious.

Cobb and Courville claim they should not be sanctioned because their motives were strictly philanthropic, and insist that they structured the postdated check scheme so their financially distressed clients could obtain immediate chapter 7 bankruptcy relief and not have to wait until they could afford to pay a lawyer in full, up-front. They made a point of saying that even if all fifteen checks bounced, and NSF bank charges of $35 for each check were incurred, the debtor still got a good deal (*see* Sanctions Response 6). They argued that the postdated check scheme put the risk of nonpayment on the Law Firm as opposed to the debtors; rather than being criticized, Cobb and Courville claim that the postdated check arrangement should be viewed as an unselfish undertaking. They contend that they have done nothing improper and, therefore, sanctions are not warranted. The Court disagrees.

According to Cobb and Courville, the Court should ignore their numerous failures to follow the Code and Rules because of the financial relief their chapter 7 debtors received through their efforts. This reasoning overlooks, of course, the fifteen checks for $100 each that the debtors had to cover after their cases were filed – checks that were never mentioned in the 528 Contracts or any disclosure, schedule, statement or other document provided to the debtors or filed with the Court. Cobb and Courville also claim that they received numerous letters from debtors thanking them for their help and expressing satisfaction with their efforts. They also point out that the majority of their business comes from referrals. They concluded their Sanctions Response by reciting the dollar amount and number of claims against their clients that were

5

discharged, the number of garnishments and lawsuits halted, and the meager average amounts their clients had in their bank accounts. But even if true, the ends do not justify the means and do not mitigate against sanctions.

The same debt relief Cobb and Courville claimed to have obtained for their debtors who paid with secret postdated checks is likewise achieved in chapter 7 cases filed by lawyers who properly collect and disclose their fees. In the Northern District of Alabama, hundreds of chapter 7 cases are filed each month by lawyers who abide by the Code and Rules, and who disclose and collect their fees in a manner that does not create a conflict of interest, or violate the automatic stay and discharge injunction. Notwithstanding their feigned altruism, it is not difficult to discern what motivated Cobb and Courville: Providing credit terms to potential debtors was a good marketing ploy, aimed at a client-base that in many cases had already fallen victim to other unscrupulous offers to pay me later, and was a way of gaining a competitive advantage over competing firms that did not employ such tactics.[3]

Cobb and Courville continue to argue that the Eleventh Circuit's decision in *Brown v. Gore (In re Brown)*, 742 F.3d 1309 (11th Cir. 2014) has made it impossible for them to use chapter 13 as a means to collect their fees in cases where their clients otherwise belong in chapter 7.[4] They complain that compliance with *Brown* forced them to finance their chapter 7

---

[3] As Cobb stated at the January 9, 2014 hearing on this matter, "Because I knew that somewhere down the line Bond Botes [a competing law firm] . . . or somebody was going to raise the issue, so I made sure that everybody that come into my office, when we got to this contract, we went over it." (Doc. 68, 16:6-9.) "I go over it in great detail because I knew that sooner or later somebody was going to complain, some law firm or somebody, because I am dealing with folks that have no money. Lots of people that come to me have left some law firm that's wanting a thousand, 12-, 1,500 down and another 4- or 500 [dollars]." (Doc. 68, 40:16-20.)

[4] In the First Opinion, the Court responded to Cobb's complaint that *Brown* was putting him out of business. (First Opinion n. 15.)

debtors on a postpetition basis because they can no longer use a chapter 13 trustee as their fee collection agent. *Brown* originated in this Court, 2012 WL 909782 (Bankr. N.D. Ala. 2012), and was affirmed by the District Court, 2012 WL 6609005 (N.D. Ala. 2012) before being affirmed by the Eleventh Circuit. In *Brown*, the Eleventh Circuit held that collecting attorney's fees cannot trump what is best for the debtor; but contrary to the Circuit Court's decision in *Brown*, that is exactly what Cobb and Courville are promoting here.[5]

Although the Court, the BA, and trustees have a duty to protect debtors from being preyed upon by unscrupulous lawyers, the reality is that the large number of bankruptcy cases filed and administered makes performing that duty virtually impossible when the arrangements for collecting fees are purposely concealed. That is why sanctions, including disgorgement of all fees, is an appropriate remedy for nondisclosure.[6] As discussed in the First Opinion, the Law Firm's unorthodox postdated check scheme went undetected for over two years, was employed in almost 300 cases, and was discovered only through happenstance. The Court finds support from Cobb's own words for its finding that the postdated check scheme's most glaring deficit

---

[5] In their Sanctions Response, Cobb and Courville seem to be arguing that if this Court would simply refuse to follow *Brown,* none of their problems with the postdated check scheme would have arisen – all of their postdated check chapter 7 cases could have been filed under chapter 13 regardless of what was in their clients' best interest. Cobb was the debtor's attorney in *Brown,* and his argument brings to mind Flip Wilson's excuse: "The devil made me do it." If that is what he is arguing, he must see this Court, and perhaps two others, as wearing the horns and tail.

[6] "Counsel's fee revelations must be direct and comprehensive. Coy or incomplete disclosures which leave the court to ferret out pertinent information from other sources are not sufficient. Anything less than the full measure of disclosure leaves counsel at risk that all compensation may be denied." *In re Saturley*, 131 B.R. 509, 517 (Bankr. D. Me. 1991). This succinct statement of debtor-attorneys' fee disclosure obligations stands in stark contrast to the way Cobb and Courville have turned the duty to disclose on its head: "If anyone was curious as to how his debtors purported to pay him, they simply had to ask," (Sanctions Response 8) which is an admission that the disclosures were not sufficient to tell the real story.

7

was the absence of any mention of the postdated checks in the 528 Contracts – the written agreements between debtors and their attorney mandated by Code § 528. In his deposition, Cobb confessed that his 528 Contracts were deficient:

Q.    Okay. In any of those cases listed on Schedule A do the client contracts [i.e., 528 Contracts] disclose the check arrangement?
A.    No.

(Cobb Dep. 10:15-18.)
                              *        *        *
Q.    So there is no writing or documentation of the postdated check arrangement. Is that a correct statement?
A. Yes.

(Cobb Dep. 26:20-23.)
                              *        *        *
Q.    For some reason you couldn't disclose [the postdated check arrangement] in writing?
A.    I could have. I didn't see any point in it.

(Cobb Dep. 57:15-18.)[7]

---

[7] Similarly, Cobb was asked in his deposition why his Disclosures of Compensation (Official Forms B203) required by Rule 2016 did not disclose his postdated check arrangement:

Q.    Do you disclose the postdated check arrangement in your 2016 statement?
A.    There is no place on there for it.
Q.    So no?
A.    No. I didn't write it on the back of it, or front of it or on the side or nowhere else, Rob.

(Cobb Dep. 64:4-10.)

    The attorney's certification at the end of Official Form B203 states that "I certify that the foregoing is a complete statement of the agreement or arrangement for payment to me for representation of the debtor(s) in this bankruptcy proceeding." The official instructions for completing the form remind debtors' attorneys that Rule 2016(b) requires that "A supplement to the statement must be filed within 14 days after any payment or agreement not previously disclosed." The Forms B203 filed by Cobb made no mention of the agreement to pay attorney fees via postdated checks over a period of fifteen months, and after the checks were mailed back to Cobb he never filed a supplement disclosing their receipt.

8

Cobb and Courville claim their fee arrangement was also "different" because, unlike other lawyers who were sanctioned in reported cases cited in the First Opinion, they "made no attempts to collect attorney fees . . . ." (Sanctions Response 2.) Nothing could be further from the truth. Cobb systematically deposited a debtor's postdated check each month for the purpose of collecting attorney's fees, and if that check bounced, another was deposited the next month, and the next, and the next for 15 months. Cobb and Courville did not need to write letters or make phone calls to collect their fees; Cobb simply reached in an envelope, took out a check, and let the bank act as collecting agent for the Law Firm. Indeed, Exhibit 1 (Doc. 86-3) to the BA's Sanctions Report reveals that one poor debtor (who had two cases handled by the Law Firm) had 17 NSF checks presented to his bank, another debtor had 12, and at least 13 others had 6 or more.[8]

---

[8]In their Sanctions Response (p.7), Cobb and Courville tout the large number of debts owing to payday lenders that were discharged in their debtors' cases. Payday lenders often require their customers to turnover postdated checks that are deposited when the loans mature--a payment arrangement not unlike what Cobb put in place for his customers. The use of postdated checks to pay consumer debt was recently criticized and may soon be regulated, if not disallowed, by the Consumer Financial Protection Bureau:

> For decades, these [payday] loans have been largely targeted at lower-income borrowers as well as those with troubled credit histories.[] The CFPB's proposals under consideration also would restrict payday lenders from some questionable practices by preventing repeated and unexpected withdrawals from consumers' bank accounts.[] Most payday lenders can access borrowers' checking accounts and withdraw the funds they are owed, often resulting in high fees when the withdrawal exceeds the checking account balance.

AnnaMaria Andriotis, *Payday Loan Rules Proposed*, The Wall Street Journal, March 26, 2015, at C3.

## IV – <u>Absence of Records</u>

Cobb's deposition revealed much about his attitude toward his clients and about the Law Firm's standard practices, none of which was encouraging and none of which showed any cause why sanctions should not be imposed. Cobb's deposition testimony established that neither he nor the Law Firm maintained records of the postdated checks that debtors mailed to the Law Firm after their cases were filed. The Law Firm kept no records that reflected how much any debtor had paid, how much of the fee remained unpaid, which debtors' checks cleared, or which ones were returned for insufficient funds. Apparently the information in Cobb's Initial Response regarding the postdated checks and payment of the Law Firm's fees and expenses was entirely generated from copies of debtors' checks and from records supplied to the Law Firm by its bank (or perhaps Cobb's bank — the ownership of the checking account used in the scheme was not clear) *after* the Court issued the First Opinion and First Order. The Court must assume the total absence of independently maintained accounting records by Cobb and the Law Firm was the reason Cobb blatantly disregarded the instructions in the First Order requiring that he verify under penalty of perjury the accuracy and completeness of the information he was to submit to the Court and the BA, as discussed *supra* at pages 2-3.

Consider the following questions and Cobb's answers taken from his deposition:

Q.      Which ones did they not mail you checks back? I understand if it was cash or money order. But every designation that says "checks," can the Court and I assume that you received postdated checks in every one of those cases? I'm not trying to put words in your mouth. I'm trying to determine when –
A.      Again, I wouldn't know that, Rob, but I would say probably 90 percent, 95 percent, 99 percent, I don't know. I don't keep them kind of records.

(Cobb Dep. 16:7-18.)

                                        *        *        *
Q.      Do you keep records of when a client's check bounces?
A.      No.

(Cobb Dep. 28:3-5.)

           \*       \*       \*

Q.      Let's wait just a second.  When checks come into your office from a client that you filed a case for, what do you physically do with these postdated checks?

A.      Take them back to my home office.

Q.      Where do you put them, or how do you keep them organized in your home office?

A.      Well, we just took them out by the month, you know, kind of had them by the month they were due to start with.  And then later on, we just kept them in an envelope.

Q.      What envelope?

A.      What envelope they mailed back.

Q.      But you never bothered to count or record the exact number of checks you got?

A.      Well, all the checks would have been $100 with a few exceptions.  And as far as counting them, no, I didn't count them.  I might have counted some.  Some I didn't.

(Cobb Dep. 32:5-33:4.)

           \*       \*       \*

Q.      Do you not have any kind of ledger where you record what monies come in from clients?

A.      Not at that time, I didn't, Rob.

(Cobb Dep. 38:23-39:3.)

           \*       \*       \*

Q.      There is no record of the cash you got coming in associated with this debtor?

A      Well, again, I said probably on the deposit slip, anybody that paid cash, I would have put cash, 100.

Q.      Is it 100, or are you just guessing it was 100?

A.      Well, I'm guessing it's 100.

(Cobb Dep. 39:13-20.)

           \*       \*       \*

Q.      So you don't know if they are insufficient funds, correct.  You don't know that there were bounced checks there?

A.      No.

(Cobb Dep. 43:12-16.)

           \*       \*       \*

Q.      If you don't know what every entry on here means, how is anyone else going to know?

A.      It means they paid $100.  Now, you are asking what happened to the checks.  I don't know what happened to the checks.  I know I didn't have them on December 13th.

Q.      Very good.  You don't know what happened to two checks in the Erika Smith case or what –

A.      I don't know if they picked them up or told me to burn them.  Either way –

Q.      Or they bounced for insufficient funds.

A.      Well, yes.  After they bounced – a lots of them bounced.

(Cobb Dep. 44:11-45:3.)

           \*       \*       \*

Q.      You don't record when you receive all the checks together in the mail, correct?  When somebody mails you the 15 checks and you have them - -
A.      No, I didn't record them.  No.
Q.      When you negotiate each of those checks on whatever date it says, do you record that anywhere?
A.      It would only be on the deposit slips.
Q.      There is no internal document in your office where you record it?
A.      No, no.

(Cobb Dep. 118:6-17.)

Cobb's answers to the BA's questions revealed a cavalier attitude toward his clients and their payments, and disclosed he had no concern for how his postdated check scheme and dearth of records might impact his clients or could even result in an overpayment of attorney fees:

Q.      Hypothetically if Diane Green accidently sent you 20 checks –
A.      Well, I'd probably have run 20 through.
Q.      And you would have been, in that hypothetical instance, overcharging the client?
A.      Well, if she mailed them to me I wouldn't over charge her.  She was just giving me a bonus or paying me what she wanted to, voluntary repayment.  I think that is what the agreement says all the way through, Rob.

(Cobb Dep. 33:5-16.)
                            *       *       *
Q.      Isn't this entire arrangement designed to confuse the debtors?
A.      No.  How can I confuse them?  He is the one that writes the checks.
Q.      Mr. Cobb, you are confused about how much you charged them and the number of checks you got.  Wouldn't the debtor be confused.
A.      No. He wrote the checks, so he would know how many checks he gave me.

(Cobb Dep. 107:7-16.)
                            *       *       *
Q.      What about Patty Smith?  How did she overpay you $100?
A.      Well, because Patty forgot she had mailed me the check, and she mailed a second set of checks.  And so we deposited the two checks.  One of them bounced.  And she is an elderly lady.  Of course, we don't keep up with it.  We just deposited all that we had a check on.
. . .
Q.      Did you pay her back for the insufficient funds charges she had to pay?
A.      She didn't ask for it back.  She is the one that sent the two checks, Rob.  I didn't.
Q.      Don't you have an obligation to make sure you are collecting the correct fee from your client?
A.      Well, if they are mailing me the fee, I figure they have an obligation to keep up with it if they mail me one set of checks or two sets of checks. . . .

12

(Cobb Dep. 133:3-12, 134:17-135:6.)

According to Cobb, if Ms. Smith's second check had not bounced, his Law Firm would have been justified in retaining her inadvertent payment of double the agreed-upon monthly fee. Cobb unapologetically argued that Ms. Smith, "an elderly lady," had "an obligation to keep up with [payments to Cobb]." Cobb had a distorted view of his relationship with Ms. Smith and other clients who paid with postdated checks. Cobb and Courville were their lawyers and, even ignoring the impropriety of the fee arrangement, Cobb and Courville had a fiduciary obligation that required them to maintain records that would reflect the status of their clients' accounts, including how many checks had been received and their amounts, as well as what portion of the fees had been paid and how much remained unpaid, all of which would have disclosed an inadvertent overpayment.[9] It is simply wrong for a lawyer to overcharge a client. A lawyer's willful neglect or turning a blind eye to a client's oversight is no excuse, especially in these cases where payments were made in a confusing and obscure manner that was prescribed by Cobb to finance his undercover bankruptcy mill.[10]

### V – Net Fees Collected From Postdated Checks

Based on the information reported in Cobb's Initial Response, as analyzed in the BA's Report, from January 1, 2012 through July 11, 2014 (the "Investigated Period") the postdated check scheme was used in 271 cases (out of a total 325 cases) originally filed under chapter 7,

---

[9] In addition, even if Cobb's initial disclosure of his fees had been adequate, to comply with Rule 2016(b) he would have had to later disclose an overpayment in a supplemental disclosure. But Cobb would never be alerted that an overpayment had been received because he maintained no records. *See also* Code § 329 and Rule 2017.

[10] Cobb's excuse for keeping a client's overpayment is akin to a cashier's pocketing the change when a customer unknowingly overpays the bill. Regardless of how one might try and justify such unsavory conduct, profiting from someone's innocent mistake is simply wrong, particularly when the profiteer is in the role of fiduciary.

and in those cases the Law Firm collected $118,759.50 for attorney fees, after deducting out-of-pocket expenses and filing fees ("Net Fees"). Cobb also employed the same fee arrangement during the Investigated Period in 21 out of 67 cases originally filed under chapter 13, after they were converted to chapter 7, and was able to collect additional Net Fees in those 21 cases of $9,212.16. Thus, the Net Fees collected by the Law firm in cases that utilized postdated checks during the Investigated Period total $127,971.66.[11]

VI - Failure to Seek Filing Fee Waivers For *In Forma Pauperis*-Eligible Debtors

In its First Opinion, the Court estimated that in approximately one-half of Cobb's postdated check cases, the debtors' diminutive incomes made them eligible for *in forma pauperis* ("IFP") waivers of their filing fees pursuant to 28 U.S.C. § 1930(f) ("IFP-debtors"). In fact, the BA's Report concluded that the incomes scheduled by debtors in 159 cases qualified them for a waiver of their filing fees. However, Cobb did not file a single filing-fee-waiver application (Official Form B 3B) for any of those IFP-debtors who unnecessarily paid filing fees that totaled $48,654, or $306 in each IFP case. In fact, he never discussed the possibility of filing for such a waiver with any of his clients who might have qualified.[12] (Cobb Dep. 152-154, quoted *infra*.)

During his deposition, Cobb was asked why he did not take advantage of the IFP filing fee waiver for his most destitute clients:

---

[11] These are Net Fees actually pocketed by the Law Firm from cashing postdated checks before the scheme was discovered. It does not include checks that were not cashed, but, according to Cobb, were returned to clients after the fee arrangement was discovered and came under attack by the BA.

[12] Cobb would not even seek an IFP waiver for a debtor whose "wife worked for me for a long time, kind of like a daughter." (Cobb Dep. 149:8-10.)

Q. For these suspect cases, this window of time, when you meet with clients that could qualify under the numbers for in forma pauperis, do you discuss that as an option with them? For these cases did you discuss that as an option?

A. No, I didn't. I didn't have that option.

Q. Why didn't you discuss it as an option for the clients that would have qualified under the income limits?

A. Because they wouldn't qualify if they were paying me later.

. . .

Q. Why would you not explain that option for her, or did you?

A. Well, I don't remember if I did or didn't, but I wouldn't think so.

Q. And why would you not explain that option to a debtor who would qualify for that?

A. Because on the form you have to fill out, it says explain why. You couldn't have made installments. If they can pay me $100 a month, then they can pay installment payments.

Q. So in all those cases, 325 – As I add them up, there are about 165 that would qualify for in forma pauperis. You didn't file a single motion in any of them because they could pay the fees in installments?

A. Yeah.

(Cobb Dep. 152:15-153:4; 153:18-154:13.)

Cobb's explanation for why he did not file any applications for IFP filing fee waivers – or even explain to his clients why they likely qualified for the waiver – was less than candid. The simple answer is that if such applications were filed, Cobb's check arrangement would have been disclosed. IFP-debtors who were caught up in the postdated check scheme would have had to disclose, in answering question 18 of the waiver application, that they had promised or expected to pay the Law Firm on a postpetition basis. In an ironic display of convenient conscience, Cobb now wants to use the fact that his debtors could "afford" to pay him $100 a month as the reason he would not consider having them certify that they could not afford to pay the filing fee in installments, as required for the fee waiver. Had the debtors paid their attorney up-front, rather than through a series of post-dated checks, their ability to qualify for a fee waiver would have been enhanced rather than impaired because their assets would have been depleted by the attorney fee amount. By not explaining that option, Cobb made the bankruptcy process even

more expensive for over half his clients, and created the very situation (i.e., anticipating he will have their postdated "installment" checks in hand) that he now relies upon to justify his failure to seek waivers. For the scheme to have survived, it needed to evade detection, even if doing so cost each IFP-debtor a $306 filing fee they could have otherwise avoided.

## VII - Insufficient Funds Checks

As disclosed in Cobb's deposition testimony, it was common for a client's check to be returned unpaid due to nonsufficient funds ("NSF"). The BA's Report, which relied in large part on information supplied in Cobb's Initial Response, stated that there were 368 NSF checks returned unpaid. When asked whether he refunded NSF fees charged by a particular client's bank for a bounced check, Cobb expressed no regrets for causing his client to incur unexpected expenses she obviously could not afford:

Q.    Did you pay her back for the insufficient funds charges she had to pay?
A.    She didn't ask for it back. She is the one that sent the two checks, Rob. I didn't.

(Cobb Dep. 134:17-22.) Such disdain was impossible to reconcile with Cobb and Courville's position in the Sanctions Response that they were the champions of the poor, and that this scheme was their self-sacrificing attempt to serve the destitute. Their sanctimony was particularly evident when Cobb blithely justified accepting overpayments, ignored IFP filing fee waivers to promote his self-interest, and caused repeated overdrafts for his firm's most financially vulnerable clients. This is the stuff of bar complaints, not meritorious service awards, and supports the imposition of sanctions.

## VIII – Sanctions – Discussion

A – *Court's Authority*:

A bankruptcy court is authorized to "'issue any order, process, or judgment that is necessary or appropriate to carry out the provisions' of Title 11 of the United States Code, which

16

governs bankruptcy proceedings. 11 U.S.C. § 105(a). The court may *sua sponte* take any action or make any determination 'necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.' *Id."* *In re Gleason,* 492 Fed. Appx. 86, 88 (11th Cir. 2012); *cert. denied,* 133 S. Ct. 1748 (U.S. April 1, 2013). A bankruptcy court, in addition to its statutory authority, also has the inherent power to impose sanctions: "A federal court's inherent powers 'include the power to control and discipline attorneys appearing before it,' . . . and to suspend attorneys who practice before it, *see In re Snyder,* 472 U.S. 634, 643, 105 S. Ct. 2874, 2880, 86 L.Ed.2d 504 (1985); *see also In re Evergreen Sec., Ltd.,* 570 F.3d 1257, 1280 (11th Cir. 2009) (upholding the bankruptcy court's judgment imposing monetary sanctions and suspending an attorney from practice before the bankruptcy court for five years)." *Gleason*, 492 Fed. Appx. at 89. *See also Gwynn v. Walker (In re Walker)*, 532 F.3d 1304, 1309-10 (11th Cir. 2008).

Neither Cobb nor Courville have submitted any credible argument or evidence – in response to the First Order, the Show Cause Order, or at any of the hearings on this matter – to establish grounds for withholding sanctions. Reading their Sanctions Response and Cobb's deposition transcript, and hearing Cobb's testimony and arguments only serves to reinforce the conclusions reached in the First Opinion that the self-serving scheme and its nondisclosure violated the canons of ethics, and the Code and Rules. For the reasons stated in the First Opinion, in this Second Opinion, and on the record at the hearing on the Show Cause Order, the Court finds that Cobb and Courville are each guilty of bad faith and, therefore, should be sanctioned as herein provided.[13]

---

[13] "An attorney subject to sanctions is entitled to due process, which includes 'fair notice that [his] conduct may warrant sanctions and the reasons why,' as well as the opportunity to respond. *Mroz,* 65 F.3d at 1575. He must be given the opportunity to justify his actions either orally or in writing. *Id.* at 1575-76. After that, a finding of bad faith is 'the key to unlocking the court's inherent power' to impose sanctions. *In re Porot,* 645 F.3d 1294, 1304 (11th Cir. 2011)."

17

B - *Disgorgement of Net Fees*:

The BA's Sanctions Report recommended that sanctions against Cobb should include disgorgement of all Net Fees collected by Cobb in the 271 cases originally filed under chapter 7, and also in the 21 chapter 13 cases later converted to chapter 7, in which the postdated check scheme was employed. As mentioned above, the Net Fees collected by Cobb in the postdated check cases totaled $127,971.66. The Court agrees with the BA's recommendation and finds disgorgement of the Net Fees is an appropriate sanction in the Suspect Cases that utilized Cobb's postdated check fee collection scheme. *See, e.g.*, *Electro-wire Products, Inc. v. Sirote & Permutt, P.C. (In re Prince)*, 40 F.3d 356 (11th Cir. 1994) (denial of all attorney fees and expenses appropriate due to conflict of interest belatedly disclosed); and *Quarles and Brady LLP v. Maxfield (In re Jennings)*, 199 Fed. Appx. 845 (11th Cir. 2006) (disgorgement of prepetition retainer and denial of all compensation not an abuse where attorney failed to disclose conflict of interest). *See also Bethea v. Robert J. Adams & Assoc.*, 352 F.3d 1125 (7th Cir. 2003) (requiring disgorgement of all attorney fees collected in violation of automatic stay or discharge injunction); *In re Lawson*, 437 B.R. 609 (Bankr. E.D. Tenn. 2010) (disgorgement of all fees received pre- and post-petition, in addition to other sanctions, as remedy for attorney's post-dated check scheme); *In re Waldo*, 417 B.R. 854 (Bankr. E.D. Tenn. 2009) (disgorgement of all fees warranted as sanctions for attorney's post-dated check scheme involving inaccurate compensation disclosures, violations of automatic stay and discharge injunction, and conflict of

---

*Gleason*, 492 Fed. Appx. at 88. In the Show Cause Order, the Court ordered both Cobb and Courville to appear and "show cause, if there be any, why sanctions as recommended by the Bankruptcy Administrator, or as may be fashioned by the court, including, but not limited to, monetary sanctions, disgorgement of fees and expenses received from chapter 7 clients, and loss of filing privileges, should not be imposed as a result of the post-dated check scheme that was the subject of the court's [First Opinion]."

interest between attorney and debtor-client); *In re Lewis*, 309 B.R. 597 (Bankr. N.D. Okla. 2004) (disgorgement of all fees, less filing fee, and requiring additional disclosures, and finding postdated checks were property and receipt thereof by debtor's counsel must be disclosed).

C - *IFP-Debtors' Filing Fees:*

In calculating the Net Fees, the BA's Sanctions Report gave Cobb a credit for filing fees and out-of-pocket expenses paid on behalf of debtors. The BA's Sanctions Report did not draw any distinction between filing fees paid by IFP-debtors and those who were not entitled to IFP fee waivers. Although not recommended by the BA, the Court finds that it would be unconscionable to give Cobb credit for filing fees paid by IFP-debtors, especially when the reason Cobb did not file IFP fee-waiver applications was to avoid disclosing his postdated check scheme. Thus, for IFP-debtors, the Net Fees should be calculated without deduction for filing fees, thereby repaying those debtors for filing fees they never should have paid. The Net Fees to be disgorged and refunded should be increased by $48,654, the total filing fees paid by IFP-debtors.

D - *NSF Check Charges*:

The BA's Sanctions Report recommended that Cobb's sanctions include $50 for each postdated NSF check. As discussed in the First Opinion, NSF checks cause repercussions that go beyond the fee charged by the bank. Reimbursement of $50 for each NSF check is probably not sufficient to cover the harm done; however Cobb argued that the penalty charged by banks for a NSF check was only $35. The Court will accept Cobb's number, and impose sanctions of $35 for each NSF check negotiated by the Law Firm pursuant to the postdated check scheme. According to the BA's Report, there were 368 bounced checks, thus NSF bank penalties at $35 each total $12,880.

E - *Practice Management Program*:

As additional sanctions, the BA recommended Cobb and Courville be required to participate in the Alabama State Bar's Practice Management Assistance Program. The Court agrees with the BA's recommendation, especially after reading Cobb's deposition that revealed an in-house accounting system that relied exclusively on bank deposit slips and little else.

F - *Suspension of Filing Privileges – Insufficient Verification*:

Finally, the BA's recommended sanctions include the suspension of Cobb's filing privileges for new bankruptcy cases for six months and the suspension of Courville's new case filing privileges for 60 days. At this time, the Court will not order the suspension of filing privileges for either of the Law Firm's lawyers.[14] However, as mentioned above, Cobb failed to abide by the First Order when he did not verify under penalty of perjury the accuracy and completeness of the information he was required to submit to the Court and the BA. The BA's Report, in which he analyzed the unverified information contained in Cobb's Initial Response, was interspersed with the terms "ambiguous" and "inconsistent." In light of Cobb's failure to maintain any semblance of internal records that would enable him to reconstruct each debtor's payment history, and the reservations expressed in the BA's Report, the Court is concerned that all Suspect Cases have not been identified and the information submitted by Cobb is not accurate and complete. The Court will allow Cobb an additional 30 days to comply with the First Order.

---

[14] Cobb gave the Court the impression that neither he nor the Law Firm has the financial wherewithal to repay the Net Fees, NSF bank charges, and IFP-debtors' filing fees. Such is no excuse for their impropriety or a reason for the Court to alter its decision. The Court is mindful, however, that bankruptcy is the primary area of practice for the Law Firm and its two lawyers, and suspension from practice would likely curtail a substantial part of their income that may be needed to satisfy the demands imposed in the order that will be entered pursuant to this Second Opinion.

20

He should address the ambiguities and inconsistencies identified by the BA, and clarify, supplement and correct, as necessary, the information and restate his Initial Response and exhibits (spreadsheets) in their entireties, and verify their accuracy and completeness under penalty of perjury as required under the First Order.  Failure to timely and adequately comply with the foregoing will, after notice and an opportunity to be heard, likely result in suspension of Cobb's and the Law Firm's filing privileges until there is compliance.  Likewise, should the Court later find that the information furnished by Cobb pursuant to the First Order, or the order entered in conformity with this Second Opinion, is lacking in any material respect, Cobb's and the Law Firm's filing privileges will, after notice and an opportunity to be heard, likely be suspended until there is compliance.

G - *Monetary Sanctions Against Courville*:

The BA's Sanctions Report did not recommend that sanctions imposed against Courville include the monetary sanctions which Cobb will be required to pay, i.e., disgorgement of Net Fees, reimbursement of IFP-debtors' filing fees, and NSF charges.  The Court disagrees with the BA's recommendation, and finds good cause to impose the same monetary sanctions against Courville.[15]

The Law Firm has two lawyers, and Courville is one of them.  Cobb's and Courville's names are conspicuously displayed in bold, large type, side-by-side, at the top of the Law Firm's letterhead.[16]  In the Sanctions Response, Courville maintains that she is Cobb's subordinate, that

---

[15]  The Show Cause Order was specifically directed at Courville, in addition to Cobb, and put Courville on notice that monetary and other sanctions against her were being considered as a result of the improprieties addressed in the First Opinion.  *See* n. 13 *supra*.

[16]  *See* Cobb's Exhibit 6 admitted at the January 9, 2014 hearing on the BA's Motion to Examine Debtor's Transactions With Attorney and Disgorgement of Attorney Fee and Other Relief (Doc. 35).  Exhibit 6 was a copy of the cover letter sent by Cobb on the Law Firm's

she never physically handled the checks and did not know which debtors had agreed to the postdated check arrangement, and that her involvement in the chapter 7 cases was minimal. Nevertheless, a sampling of the Suspect Cases revealed that Courville appeared in most of them as debtor's co-counsel for various matters, including a multitude of lien avoidance motions, consents to stay relief, payment of filing fees, rescission of reaffirmation agreements, financial management course certificates, address changes, and numerous amended schedules. Cobb testified on January 9, 2014 at one of the early hearings on this matter that, "The [prospective clients seeking bankruptcy relief] that call the receptionist usually is [sic] forwarded over to [Courville's] office, and her office is in Northport and she kind of feels them out to try to determine if they need the 7 or the 13." (Doc. 68, 35:18-21.)

Neither the Law Firm's letterhead nor anything filed in any of the Suspect Cases indicated that Courville was Cobb's subordinate, and even if she was, her silence and passivity cannot be excused. She admits she was aware of the "payment system" Cobb had put in place for the Law Firm. Courville is a licensed attorney and is, therefore, charged with complying with the canons of ethics. She is also a seasoned bankruptcy attorney charged with knowledge of the Code and Rules.

A portion of the Law Firm's income from postdated check collections went toward paying Courville's compensation for her work at the Law Firm, including her work involving the Suspect cases. Perhaps her work was mostly postpetition, but the postdated checks were delivered and cashed postpetition. She was aware of how the Law Firm was collecting its income from which she was paid and, therefore, she knowingly profited from the same scheme that paid Cobb. In spite of being an officer of the court, she never made any attempt to stop the

letterhead to debtors returning their undeposited postdated checks that were being returned after the check scheme had been discovered by the BA.

Law Firm from using the postdated check arrangement, nor did she report the illicit operations to the Court, the BA, the trustees, or the State Bar.

The Show Cause Order was directed at both Cobb and Courville. Despite numerous opportunities, Courville offered no convincing reason, and cited no authority, that would exempt her from the same sanctions imposed against Cobb. Her only defense was put forth in three paragraphs in the Sanctions Response; however, saying that she knew about the check scheme but decided to trust Cobb's judgment while spending most of her time on chapter 13 cases does not exonerate her from her responsibilities as a fiduciary to her firm's chapter 7 clients and her obligation as an officer of this Court.[17] Courville acted in bad faith when she ignored those responsibilities and obligations, acquiesced in what she knew was her Law Firm's typical chapter 7 attorney fee collection arrangement, and accepted compensation funded, at least in part, from debtors' undisclosed postdated checks. Accordingly, the Court concludes that Courville and Cobb each should be held jointly and severally obligated for all monetary sanctions that will be imposed by the Court.

## IX - Summary and Conclusion

Whether motivated by altruism or greed, payment schemes designed to subvert the Code and Rules cannot be tolerated. By necessity, bankruptcy courts must rely on the good faith and honesty of the lawyers that come before them and trust that there are no undisclosed side-deals regarding lawyers' fees. When that reliance proves to have been misplaced, the consequences, at a minimum, must be denial of all fees including disgorgement of fees already collected. Here, disgorgement serves to enforce the Code and Rules, and prevents the attorneys from retaining

---

[17] The issues discussed in the First Opinion, arising from the postdated check scheme, involve the type of dishonesty, fraud, deceit, and misrepresentation that are addressed in Alabama Rules of Professional Conduct, Rules 8.3 and 8.4.

Case 13-40938-JJR7    Doc 101    Filed 04/07/15    Entered 04/07/15 13:25:32    Desc Main
Document    Page 23 of 25

fees not properly disclosed to the Court or their client-debtors, and collected in a convoluted and secret manner than can only be described as devious.

The conscience of the Court mandates that the IFP-debtors should be repaid their filing fees that could have been waived had the Law Firm not been hiding receipt of postdated checks. IFP-debtors should not be penalized because their lawyers were putting their own interests first. And the same is true for NSF check charges. If the postdated checks had not been deposited as part of the Law Firm's pervasive scheme, no NSF charges would have been incurred.

Cobb knew his check scheme was not without risk – he admitted as much (*see* note 3 *supra*) – and naivete, whether actual or feigned, provides no defense for Courville. Nonetheless, the Court is attempting, as nearly as possible, to put everyone – Cobb, Courville, and their debtors – in the same position they would have been in, if the postdated check scheme had never reared its ugly head. Disgorgement of all Net Fees, reimbursement of NSF charges, and the reimbursement of IFP-debtors' filing fees, are the minimum monetary sanctions that will achieve that result. Even allowing the two attorneys in this case to keep at least *quantum meruit* fees for what they argue was a job well done would eviscerate the Code's, the Rules' and the Eleventh Circuit's directives: When it comes to attorney fees and the manner in which they will be paid by a debtor in a bankruptcy case, especially when the debtor is an individual, nothing less than clear, precise, and complete written disclosure to the court and debtor is acceptable – attorneys who do not comply risk not being paid.

VII - <u>Sanctions: Order</u>

The Court will enter a Second Order in conformity with the findings and conclusions set forth in this Second Opinion.

Done and dated this 7th day of April 2015.

<u>/s/ James J. Robinson</u>
JAMES J. ROBINSON
U.S. BANKRUPTCY JUDGE

Case 13-40938-JJR7   Doc 101   Filed 04/07/15   Entered 04/07/15 13:25:32   Desc Main
Document      Page 25 of 25