UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

In re:                                    }
                                          }
CLYDE L. DAVIS, JR.,                      }         Case No. 13-40938-JJR7
                                          }         Chapter 7
            Debtor.                       }

THIRD MEMORANDUM OPINION

I – Introduction and Background

This is the third opinion ("Third Opinion") the Court has written concerning the

undisclosed scheme utilized by Cobb and his Law Firm to collect their fees from the debtor in

this case and from debtors in almost 300 additional cases.[1] Cobb filed a Motion to Amend or

Alter (Doc. 105) the Second Order entered pursuant to the Second Opinion, and Courville – a

lawyer-employee of the Law Firm – also filed a Motion to Amend or Alter (Doc. 108) the

Second Order. The Second Order required Cobb and Courville to, among other things, disgorge

attorney fees collected in Suspect Cases which utilized a postdated check scheme, and refund

filing fees paid by IFP-debtors and NSF bank charges incurred by debtors in Suspect Cases.

The Motions came before the Court for a hearing on April 30, 2015. At the hearing,

Cobb and Courville urged the Court to vacate all sanctions imposed under the Second Order.

Cobb's arguments at the hearing, like those made in his Motion, were for the most part the same

as those previously made in response to the Show Cause Order and were addressed by the Court

in the Second Order. The Court will not consider recycled arguments; to do so would be

tantamount to allowing Cobb to relitigate the same issues already adjudicated in the First and

_____

[1] Unless otherwise defined herein, terms defined in the First and Second Opinions shall
continue have the same meanings when used in this Third Opinion.

1

Second Opinions and First and Second Orders. Similarly, with two significant exceptions, the Court will not consider new arguments or evidence which could and should have been made and offered during the prior proceedings that culminated with the entry of the Second Order. Exercising its discretion, however, the Court will take into account newly offered arguments and evidence supporting Courville's position that she, as opposed to Cobb, should not be sanctioned.[2] Similarly, at the hearing on the Motions, the Court allowed into evidence, without objection from any party, two email threads between the BA and Cobb that shed considerable light on when the postdated check scheme was instigated and Cobb's failure to truthfully respond to the BA's inquiry about the workings of the scheme. Regardless of whether new or old, the Court will not take into account irrelevant arguments or evidence, which are essentially red herrings that attempt to distract from the essence of Cobb's and the Law Firm's failure to comply with the fee-disclosure mandates and fee-collection restrictions imposed by the Code and Rules.

## II – Rules 59(e) and 60(b), Federal Rules of Civil Procedure

Both Motions stated that they were brought pursuant to Fed. R. Civ. P. 59(e), made applicable to bankruptcy proceedings by Fed. R. Bankr. P. 9023. Additionally, Fed. R. Civ. P. 60(b), made applicable to bankruptcy proceedings by Fed. R. Bankr. P. 9024, appears equally pertinent to the Motions. Rule 60(b) provides that "On motion and just terms, the court may relieve a party . . . from a final . . . order . . . ." Scrutinizing both Rules 59 and 60, the U.S. Bankruptcy Court for the Northern District of Georgia stated in *In re Chandler*, 2008 WL 7842073 (Bankr. N.D. Ga.) that:

Rule 60 of the FRCP, made applicable to bankruptcy proceedings by Rule 9024 of

---

[2] Courville recited additional facts pertaining to her involvement, or lack thereof, in the check scheme. Although she could have previously offered these facts, the Court will exercise its discretion and take them into consideration in ruling on the relief Courville seeks in her Motion.

Case 13-40938-JJR7   Doc 119   Filed 05/08/15   Entered 05/08/15 14:47:15   Desc Main
Document     Page 2 of 15

the FRBP permits a court to grant a party relief from a final judgment, order, or proceedings for any reason justifying the relief.

> The goal of the provisions is to correct errors of law or misapprehensions of fact. Motions to reconsider are not to be used (i) to relitigate issues, (ii) as a substitute for appeal, or (iii) to raise arguments which could have been asserted prior to entry of order. Nonetheless, the decision to alter or amend a judgment is in the sound discretion of the trial judge. *Futures Trading Comm'n v. Am. Commodities Group*, 753 F.2d 862, 866 (11th Cir. 1984).

*Chandler* at *2 (citations omitted).

And in *O'Neal v. Kennamer*, 958 F.2d 1044 (11th Cir. 1992), the Eleventh Circuit held that:

> This court will not overturn a denial of a Rule 59 motion absent abuse of discretion. Motions to amend should not be used to raise arguments which could, and should, have been made before the judgment was issued. *Lussier v. Dugger*, 904 F.2d 661, 667 (11th Cir. 1990). Denial of a motion to amend is "especially soundly exercised when the party has failed to articulate any reason for the failure to raise the issue at an earlier stage in the litigation." *Id.*

*O'neal*, 958 F.2d at 1047 (citation omitted).

## III – Cobb's Motion

"Part I - Background" of Cobb's Motion is irrelevant, and again attempts to justify his abuse of chapter 7 debtors because this Court, the District Court, and the Eleventh Circuit previously put a stop to his abuse of chapter 13 clients. *See* Second Opinion notes 3 and 4, at 6; First Opinion note 15, at 9. The email threads introduced into evidence at the April 30 hearing, as discussed below, discredit Cobb's argument that this Court – and apparently the District and Circuit Courts as well – forced him to utilize postdated checks to collect his fees because they put a stop to his exploitation of debtors by putting them in chapter 13 cases for no legitimate reason other than to collect attorney fees. It should go without saying that putting a stop to Cobb's abuse of chapter 13 debtors did not give him a green light to abuse chapter 7 debtors and ignore the fee disclosure and collection requirements embodied in the Code and Rules

"Part II – Routine," of Cobb's Motion is no more than another, albeit more respectable, recital of the procedure Cobb followed in the postdated check scheme and will not be revisited.

"Part II [sic] – Voluntary Repayment," was previously argued by Cobb, and rejected by the Court. But it is again worth noting that even if debtors' checks were considered gratuities, as Cobb continues to argue, he nevertheless made no supplemental filings or disclosures after he received the checks, and thereby violated Rule 2016(b) of the Fed. R. Bankr. P., which requires that "A supplemental statement shall be filed . . . within 14 days after any payment or agreement not previously disclosed." Cobb never explained why he should be exempt from the supplemental disclosure requirements of Rule 2016(b).

"Part III – Transparency," begins with another spin on why "voluntary payment" dispatched with any requirement to disclose the postdated checks in the clients' 528 Contracts. Although Code § 528 required that Cobb disclose the terms of payment to his clients, he continues to argue that, although his clients were verbally instructed to return their envelopes full of checks when they received notice that their cases had been filed, they could have simply refused to put the envelope in the mail, and justify not paying their lawyer because of the "voluntary payment" language written in the 528 Contracts. Of course, the option to not return the checks was not written anywhere, so we must take Cobb's word for what he told his clients and speculate about their understanding of the arrangement. We do know that virtually all debtors did as they had committed to do and returned their checks, not knowing what repercussions would follow if the checks were not returned. As mentioned, we do not know exactly what Cobb told his clients, and therein lies one critical problem: Code § 528 requires that "the terms of payment" be "explain[ed] clearly and conspicuously" in a "*written contract*" between the debtor and his attorney. Verbal explanations and agreements, and speculation of

4

what debtors understood, do not satisfy § 528.

Part III also revisits Cobb's argument that his fee disclosures as debtors' counsel – Forms B203 – submitted pursuant to Code § 329(a) and Rule 2016(b), were completed accurately. Cobb was smart enough not to perjure himself by stating on his disclosures that his fees had been paid; rather, he completed Forms B203 by listing his fees as the "Balance Due." *See* First Opinion 7.  But how can any balance be due if the debtor was not required to pay Cobb's fee? Showing a balance due contradicted Cobb's position that the debtors did not have to pay his fees for filing their cases.  And if there was a balance due for attorney fees, why did Cobb not list himself as a creditor on his debtors' schedules?  And why did Cobb not disclose in his debtors' statements of financial affairs his receipt of their checks totaling $1,500? – receipt Cobb attempted to undo by returning, at least temporarily, the checks to the debtors.  It was too late; Cobb had already rung the attorney-fee-payment bell.  The checks were earmarked to pay Cobb's fee and no magic was worked when they were placed into a postage prepaid envelope addressed to Cobb, and handed back to the debtors with instructions to put the envelope in the mail after they were informed by Cobb's office their cased had been filed.

Part III contained a new argument, albeit the most outlandish made during this entire affair.  In so many words, Cobb blamed the Court for allowing his check scheme to go on as long as it did (although the email messages discussed below indicate it was going on longer than the Court was previously led to believe), and disingenuously concluded that "Cobb never once considered that the Court did not realize Cobb was hoping to be paid his attorney fee after the debtor paid his filing fee." Cobb Motion 7.  Because this argument could have been raised in response to the Show Cause Order, and before the Second Order was issued, it is not timely and will not be seriously considered.  Nonetheless, a closer look will demonstrate the absurdity of

Cobb's newest argument.

As discussed in the First Opinion, paying filing fees in installments facilitated the logistics of Cobb's postdated check scheme. Thus, Cobb routinely filed applications in Suspect Cases to pay court filing fees in installments – the first three postdated checks paid the filing fee installments. To bolster his assertion that the Court should have realized he was collecting his fees on a postpetition basis, Cobb quoted a sentence from Official Form B 3A, a form that serves two purposes.[3] The Form begins as an "Application for Individuals to Pay the Filing Fee in Installments" and is used in all consumer cases whether filed under chapter 7, 11, 12 or 13. In fact the first question asked on the Form is "Which chapter of the Bankruptcy Code are you choosing to file under?" And to answer the question, the debtor is given the option to check one of four boxes: "[] Chapter 7 [] Chapter 11 [] Chapter 12 [] Chapter 13." At the end of the Form is an "Order Approving Payment of Filing Fee in Installments." The order is brief and to the point, and reads the same regardless of what chapter of the Code applies.

Attorney fees paid to debtors' counsel in chapters 13 cases are allowed as administrative expenses, Code § 503(b)(2), and are entitled to be paid through chapter 13 plans as priority claims. Code §§ 507(a)(2),1326(b)(1). There are no comparable provisions in the Code that accommodate postpetition payment of attorney fees in chapter 7 cases. *See Brown v. Gore (In re Brown)*, 742 F.3d 1309, 1312 (11th Cir. 2014) ("A Chapter 7 case was thus clearly more beneficial to Brown *except for the fact that his attorney's fees could not be financed through a Chapter 7.*") (emphasis added).

Notwithstanding the priority afforded attorney fees in chapter 13, and their payment on a

---

[3] Rule 9009 provides, in pertinent part, that "the Official Forms prescribed by the Judicial Conference of the United States shall be observed and used with alterations as may be appropriate. . . . The forms shall be construed to be consistent with these rules and the Code."

postpetition basis under chapter 13 plans, Rule 1006(a)(3) requires that "All installments of the filing fee must be paid in full before the debtor or chapter 13 trustee may make further payments to an attorney or any other person who renders services to the debtor in connection with the case."[4] Hence, the provision touted by Cobb in the multi-chapter form "Order Approving Payment of Filing Fee in Installments" prohibiting "until the filing fee is paid in full . . . any additional payment or transfer of any additional property to an attorney . . . for services in connection with this case" is applicable to attorney fees paid in chapter 13 cases but is superfluous in chapter 7 cases. The restriction in the form order is a redundancy of what is already prohibited in chapter 13 cases under Rule 1006(b)(3).[5] In hundreds, if not thousands of chapter 13 cases in which Cobb served as debtors' counsel, he waited until filing fee installments were all paid before receiving payments from the trustee toward his fees. Cobb's specious argument that the restrictive language in the form order, having no application in chapter 7 cases, should have put the Court on notice that he was accepting undisclosed postpetition payments, is simply an insincere attempt at distraction, and renders his position even less credible.

After blaming the Court for his woes, Cobb concluded Part III of his Motion by casting blame on the BA in another new argument that, after a closer look, does more harm than good to Cobb's position. This new argument was founded on an April 2012 email exchange (the "2012

---

[4] Like a prospective chapter 7 debtor, nothing prohibits a prospective chapter 13 debtor from paying attorney fees before his petition is filed. Nonetheless, in most chapter 13 cases, all or the lion's share of attorney fees are paid through the plan after plan confirmation and after filing fees are first paid.

[5] Before the filing fees in his chapter 7 cases were paid, Cobb received checks from each of his debtors totaling $1,500. If Rule 1006(b)(3) applied to chapter 7 cases, he would have violated its terms by accepting the debtors' checks – property – before the filing fees were paid. This was also discussed in the First Opinion in response to the unfounded assertion that postdated checks have no value and are, therefore, not "property."

7

Email") that took place between Cobb and Robert Landry, an Assistant U.S. Bankruptcy Administrator. The 2012 Email started with an inquiry from Landry about attorney fees paid by one of Cobb's chapter 7 debtors who participated in Cobb's postdated check scheme. A copy of the 2012 Email was attached as Exhibit 3 to Cobb's Motion and another copy was received into evidence, without objection, at the April 30 hearing as BA Exhibit 1. In essence, Cobb offered the 2012 Email as new evidence in support of his argument that he had disclosed his postdated check scheme to the BA in April 2012, and that it was implicitly approved by the BA, if not the Court. Nothing could be further from the truth. To put the 2012 Email in context, the BA offered an earlier email exchange with Cobb that occurred in October 2010 (the "2010 Email").[6]

The 2010 Email began with an inquiry by the BA about why Cobb was charging a destitute chapter 7 debtor, whose only sources of income were Social Security and food stamps, attorney fees of $2,500 for a simple chapter 7 case. Cobb's fee was at least $1,000 over the "high-end fee for routine cases."[7] The BA then asked about reports he had received concerning Cobb's fees in other chapter 7 cases:

> On another note, I have received some calls asserting that your office charges a higher fee in some Chapter 7 cases and then collects the fee post-petition through the use of post-dated checks. I don't know if this is correct information, hence this email inquiry. If this is the practice you have or are using, you must disclose that in the Rule 2016(a) statement. Please amend any petitions that are pending in which this is the fee arrangement so that the disclosure accurately reflects this practice. It is our position that this is not a permissible way to collect fees and in fact, the fees are dischargeable.

---

[6] BA Exhibit 2 – the 2010 Email – was admitted without objection at the April 30 hearing on Cobb and Courville's Motions.

[7] Cobb having been caught substantially overcharging a destitute client, and his deposition testimony reflecting a nonchalant attitude toward his clients' problems associated with the check scheme, support a finding that Cobb was motivated more by a desire to collect fees than his professed desire to help financially distressed and creditor-abused debtors. *See* Second Opinion 12, 16.

8

I would like to handle these issues without filing any type of motion or bringing it
to the court's attention if at all possible.

(BA Ex. 2.)

Cobb's reply to Landry in the 2010 Email stated that he would reduce his fee in the specific case Landry had complained about. But critically, in that same reply Cobb failed to deny the accuracy of those early reports about his use of postdated checks to collect his fees. Cobb simply concluded the 2010 Email exchange by skirting the postdated check issue: "We are currently in the process of reviewing all ongoing Chapter 7 cases concerning their fees." (BA Ex. 2.) Apparently Cobb's review of his fees in chapter 7 cases and the BA's admonishment did not persuade him to put a halt to the practice of taking postdated checks to pay his fees.

During the April 30 hearing, when the 2010 Email was first introduced, Cobb again did not deny the accuracy of those 2010 reports of his use of postdated checks, although he certainly had ample opportunity to voice a denial. Regardless, the early date of the 2010 Email disclosed two important facts. First, the 2010 Email revealed that Cobb's postdated check scheme had been going on considerably longer than the Court was previously led to believe.[8] Based on Cobb's representations of when he started using his check scheme, the sanctions imposed under the Second Order covered only "Suspect Cases" – those filed from January 1, 2012 through July 11, 2014. Second, and perhaps the most significant revelation to come out of the April 30 hearing, the 2010 Email disproves Cobb's persistent refrain that *after* the Court's decision in *Brown,*[9] he was left with no alternative other than to start collecting his chapter 7 attorney fees through postdated checks since he could no longer abuse his clients by putting them into long-

---

[8] "[A]t pp.2-3 of his Memorandum [Cobb] states that he began using the postdated-check payment plan in the early part of 2012." First Opinion note 4, at 3.

[9] *See* discussion *supra* at 3, 6.

term chapter 13 cases for no reason other than to collect attorney fees through plan payments. Debtor-Brown's chapter 13 case (Case No. 11-42825-JJR13) was not filed by Cobb until November 7, 2011 and this Court's ruling in *Brown* was issued on March 16, 2012 following a confirmation hearing on January 12, 2012. The 2010 Email established that Cobb's postdated check scheme pre-dated *Brown* – Cobb's perennial excuse – by over a year, if not longer.

The 2012 Email was further evidence that Cobb was actively concealing his check scheme, and it disclosed he was not telling the truth to the BA about how he was collecting fees in chapter 7 cases. In the 2012 Email, Cobb told the BA that "There is no agreement on how I am to be paid. It [was] completely voluntary. I had the debtor bring 15 $100 checks to our meeting and I explained if he chose to pay, that *he could send me one check per month*, starting *after discharge* . . . I will make no effort to contact the Debtor regarding payment." (BA Ex. 1) (emphasis added). In fact, as Cobb has now admitted, debtors were not told to send one check per month; they were instead told to send *all 15 postdated checks* in one envelope after they were *contacted* by phone and told their case had been filed, and that phone call typically was made as soon as a case was filed, months before discharge.

In his reply, the BA asked Cobb in the 2012 Email, "Do you retain the checks the debtor brings in to your meeting or are they returned to the debtor after the meeting? If they are returned to the debtor, why are they brought in?" Cobb responded, falsely: "We do not retain checks nor take possession of them. Debtors don't always bring in the checks. We ask them to bring them just so [we] can explain how to voluntarily pay." (BA Ex. 1.) On the contrary, based on Cobb's admissions and deposition testimony, he *did* take possession of all 15 checks immediately after a debtor's case was filed. His explanation of why the debtor was told to bring 15 checks to the meeting – so Cobb could explain how to voluntarily pay – made absolutely no

Case 13-40938-JJR7    Doc 119    Filed 05/08/15    Entered 05/08/15 14:47:15    Desc Main
Document      Page 10 of 15

sense, and more critically was false. The truth was that the checks were brought to Cobb's office so they could all be stamped by Cobb, all put into a postage prepaid envelope addressed back to Cobb, and soon thereafter, all returned when the debtor's case was filed.

In part "IV – Bookkeeping," Cobb explained that his lack of accurate accounting could be explained by his having neither the time nor money to do a better job or hire a bookkeeper, and that his system of handling the postdated checks was simple: "Cobb deposited one check per debtor per month . . . ." The Court does not understand what point Cobb is making here, but to the extent there is one, it should and could have been made before the Second Order was entered.

Cobb explains in part V of his Motion that his postdated check arrangement was not a "self-serving scheme." Cobb has presented nothing new to the Court to convince it that Cobb's ultra- complicated payment arrangement was not conceived with an eye toward gaining more market share by offering a payment plan to attract additional business from a population of clients that were accustomed to paying over time. Cobb's failure to abide by the Code and Rules, and his disregard for his clients' best interests, would not be redeemed by an altruistic motive even if such had been shown.

In part VI, Cobb again defends his failure to seek filing fee waivers for, or even discuss that option with, IFP-debtors. This, too, is an old argument. The Court has concluded that Cobb's postdated check scheme was wrong from any angle, and not filing fee-waiver applications for IFP-debtors was part and parcel of that scheme.

In part VII of his Motion, Cobb asserts "that he has already been severely sanctioned in this case." Although Cobb has yet to disgorge any fees or reimburse any debtor's filing fee or NSF check charges, he bemoans the time he has spent and expenses incurred to comply with the

11

accounting required by the First Order.[10]  Cobb has overlooked the obvious: the basis for such

accounting should have been in place already and easy to recreate had he followed even minimal

record-keeping procedures in his law practice.  The expense was a sanction Cobb imposed upon

himself when he chose to manage thousands of his clients' postdated checks without a single

bookkeeping entry other than a monthly bank deposit slip.  Cobb was no amateur, and had been

warned by the BA as early as 2010 that postdated checks were not an acceptable method of

payment.  Cobb knew his scheme was problematic and would one day come under scrutiny by

the Court.  He was willing to take that chance, and the fact that he got away with it for so long

and maintained little or no bookkeeping records which made the accounting more complex is no

one's fault but his own.

 Cobb describes the sanctions imposed in the Second Order as punitive, but they are not.

The sanctions do no more than require Cobb to disgorge fees not properly disclosed to the Court

or the debtors as required by the Code and Rules and to repay debtors for expenses – NSF bank

charges and filing fees for IFP-debtors – they would not have incurred but-for Cobb's improper

manner of collecting his fees on a postpetition basis.  These sanctions are justified, if not

required, to compel lawyers to abide by the disclosure and fee collection requirements of the

Code and Rules.  Otherwise, there would be no consequences for lawyers, like Cobb, who not

only fail to make the proper disclosures, but cost their debtors additional expenses.

 Finally, Cobb included with his Motion an affidavit by attorney Frank LaBudde in which

LaBudde, among many other things, vouches for Cobb and Courville's good character and

---

[10] Cobb also blames this Court for expenses he has incurred defending "what appears to be this Court's complaint against Cobb to the state bar in the *Brown* case [742 F.3d 1309 (11th Cir. 2014)] and in this case." Cobb Motion 12.  This Court has never, directly or through others, communicated with the Alabama State Bar with respect to Cobb's involvement with *Brown* or this case, or for that matter anything else involving Cobb, the Law Firm, or Courville.

truthfulness, and posits that he, an experienced bankruptcy practitioner, sees nothing wrong with their forms and disclosures.[11] Cobb gave no reason why Mr. LaBudde's input via affidavit or testimony was not offered at earlier hearings or with Cobb's submissions in response to the Show Cause Order. Regardless, the affidavit adds nothing material or relevant, and the Court will not consider it at this late stage in this matter.

In sum, as to Cobb's Motion, nothing new or relevant has been offered that would change the Court's earlier rulings, and the 2010 and 2012 Emails further convince the Court that those rulings were correct. Thus, Cobb's Motion is due to be denied and an order to that effect will be entered.

## IV – Courville's Motion

In contrast to Cobb's Motion, Courville raised several points that would have made a difference had they been raised earlier, and the Court will exercise its discretion and consider them in granting Courville's Motion to alter or amend the Second Order to the extent that she not be held responsible for disgorged attorney fees, IFP-debtors' filing fees and NSF bank charges incurred by debtors. At the hearing, Courville offered the following in support of her Motion: (1) despite how the Law Firm's letterhead may appear, she is an employee only and has never been a decision-maker with the Law Firm in terms of deciding what rates to charge or how to collect fees; (2) her only input when the check scheme was being developed was to ask Cobb if the scheme was within ethical and Code boundaries and he assured her it was; (3) her pay is

---

[11] Mr. LaBudde's 12-page, single-spaced affidavit is longer than Cobb's Motion. LaBudde expressed confidence in Cobb's and Courville's legal work, and touted their good will and truthfulness in their dealings with him. Mr. LaBudde did not hide the fact that he has a deep-seated, personal dislike for the judge that presides over this Court. That is unfortunate and gives me no pleasure, but the controversy that must be resolved is not between Mr. LaBudde and this Court. The issues now before the Court concern Mr. Cobb and Ms. Courville, and attempting to answer Mr. LaBudde's complaints would be a distraction from the business at hand.

fixed and does not change regardless of how profitable the firm may be, aside from a potential year-end bonus of less than $1,000; (4) she never met with or counseled any chapter 7 debtors before their cases were filed; (5) she never made a deposit for the firm or handled any fee-payments, including postdated checks from chapter 7 debtors; (6) she never practiced with any other firm or lawyers, and has practiced exclusively with the Law Firm which is controlled by Cobb, her father; (7) her primary focus with the Law Firm has been to handle chapter 13 cases; and (8) she feels more subordinate to Cobb than she would to another lawyer because he is her father and she naturally trusted him because of his many years of experience.

Inasmuch as the BA in his Sanctions Response had not recommended monetary sanctions against Courville, she offered at the April 30 hearing that she did not speak in her own defense at the hearing on the Show Cause Order, even though the Show Cause Order had alerted her that the Court was considering sanctions against both her and Cobb. The BA offered at the April 30 hearing that he had investigated Courville's involvement, and agreed it would be a sound exercise of discretion to alter the sanctions against Courville to remove her liability for the monetary amounts.

Under these facts, the Court considered Rule 5.2 of the Alabama Rules of Professional Conduct ("ARPC"), entitled "Responsibilities of a Subordinate Lawyer" which provides that, "A subordinate lawyer does not violate the Rules of Professional Conduct if that lawyer acts in accordance with a supervisory lawyer's reasonable resolution of an arguable question of professional duty." ARPC 5.2 does not exonerate Courville because Cobb's disregard for the Code and Rules was not a "reasonable resolution of an arguable question." Nonetheless, it is now apparent that Courville was not materially involved in the postdated check scheme, and because of her subordinate position, made more pronounced by the supervisory lawyer being her father,

14

in reality she was not in a position to put a stop to his use of the postdated check scheme even if she had recognized it for what it was.

Accordingly, for good cause shown, the Court will grant Courville's Motion to the extent that she will no longer be held jointly and severally liable for the monetary amounts at issue, and an order will be issued to that effect.[12]

So done this 8th day of May 2015.

/s/ James J. Robinson
JAMES J. ROBINSON
U.S. BANKRUPTCY JUDGE

---

[12] Paragraph (l) of the Second Order required Courville to attend the Alabama State Bar's Practice Management Assistance Program, and, except as stated below, that requirement will not be altered or amended because the evidence confirmed that the Law Firm's record keeping and bookkeeping were woefully deficient. Because of her subordinate position, Courville may not have been able to implement adequate record keeping and bookkeeping procedures for the Law Firm, but in light of those gross deficiencies she needs guidance for her future practice with the Law Firm or elsewhere. Accordingly, as it pertains to Courville, paragraph (l) of the Second Order is no longer a "sanction," only a "requirement," and the Second Order shall be so amended. Should Courville be asked whether she has ever been sanctioned by a court, she may truthfully respond, at least as to this matter, that she has NOT – all sanctions imposed against Courville will be stricken.